Edward R. BIONDI, individually and derivatively on behalf of HealthSouth Corporation, a Delaware corporation, Plaintiff,

v.

Richard M. SCRUSHY, George H. Strong, John S. Chamberlin, Charles W. Newhall, C. Sage Givens, Joel C. Gordon, Larry D. Striplin, Jr., William T. Owens, and Phillip C. Watkins, M.D., Defendants,

and

HealthSouth Corporation, a Delaware corporation, Nominal Defendant.

James Bachand, derivatively on behalf of HealthSouth Corporation, a Delaware corporation, Plaintiff,

v.

Richard M. Scrushy, William T. Owens, and George H. Strong, Defendants,

and

HealthSouth Corporation, a Delaware corporation, Nominal Defendant.

Civ. A. Nos. 19896–NC, 19968–NC.

Court of Chancery of Delaware, New Castle County.

Submitted: Jan. 10, 2003.
Decided: Jan. 16, 2003.

Ronald A. Brown, Jr., Prickett Jones & Elliott, P.A., Wilmington; Frank P. DiPrima, Convent Station, NJ, for Plaintiff Edward R. Biondi.

Joseph A. Rosenthal, Norman M. Monhait, Rosenthal, Monhait, Gross & God-

dess, P.A., Wilmington; Jeffrey S. Abraham, Abraham & Associates, New York City, for Plaintiff James Bachand.

Andre G. Bouchard, Bouchard Margules & Friedlander, Wilmington; Michael L. Edwards, Lee H. Zell, Balch & Bingham, LLP, Birmingham, AL, for Special Litigation Committee of HealthSouth Corporation.

Richard L. Horwitz, Peter J. Walsh, Jr., Potter Anderson & Corroon, LLP, Wilmington; Patrick C. Cooper, Maynard, Cooper & Gale, P.C., Birmingham, AL, for Individual Defendants Richard M. Scrushy, George H. Strong, John S. Chamberlin, Charles W. Newhall, C. Sage Givens, Joel C. Gordon, Larry D. Striplin, Jr., William T. Owens, and Phillips C. Watkins, M.D.

Steven J. Rothschild, Stephen D. Dargitz, Skadden, Arps, Slate, Meagher & Flow, LLP, Wilmington, for Nominal Defendant HealthSouth Corporation.

## OPINION

STRINE, Vice Chancellor.

These derivative cases come before the court on a motion filed by the Special Litigation Committee (the "SLC") of the board of directors of HealthSouth Corporation, a Delaware corporation headquartered in Birmingham, Alabama.[1] Distilled to their essence, the cases allege that certain directors of HealthSouth sold large blocks of the company's stock while in possession of material non-public information. In one of the sales – a $25 million sale by HealthSouth's Chairman and then-Chief Executive Officer, defendant Richard Scrushy – HealthSouth was the purchaser. According to the plaintiffs here

---

1. The two derivative complaints addressed in this decision, *Biondi v. Scrushy*, C.A. No. 19896–NC, 2003 WL 203069, and *Bachand v.* *Scrushy*, C.A. No. 19968–NC, have not yet been consolidated.

(the "Delaware plaintiffs"), the market price for HealthSouth plummeted once the non-public information was announced. The Delaware plaintiffs brought this suit in order to remedy what they believe to be injuries suffered by HealthSouth because of the trades made by Scrushy and other HealthSouth directors before the company publicly announced the information.

The HealthSouth SLC now seeks to stay these actions on two independent grounds. First, the SLC contends that these actions should be stayed in deference to a first-filed derivative action pending in the Circuit Court of Jefferson County, Alabama. Second, the SLC argues that these actions must be stayed to permit it to conclude its investigation and to decide what course of action is in HealthSouth's best interests.

In this opinion, I decline to grant a stay on either ground.

Because these cases and the prior-filed Alabama case are derivative actions in which the plaintiffs seek to represent HealthSouth, the *McWane* doctrine does not apply with full force here, and factors other than speed of filing are more important to the discretionary decision whether to grant a stay. In this instance, the prior-filed case was initiated by a hastily-filed and cursorily pled complaint that barely alleged one of the claims raised by the Delaware plaintiffs as to only one of the transactions raised by them. Although purporting to be a derivative complaint, the prior-filed complaint did not attempt to plead demand futility with particularity. Indeed, most of the prior-filed complaint deals with issues not even raised in these Delaware actions, and the one overlapping claim seems to have been thrown in as a last-minute incidental addition.

By contrast, the Delaware complaints are obviously the product of diligent research and plead claims and demand excusal with particularity. In view of this fact,

it is not apparent why HealthSouth and its stockholders should have their claims litigated under the less substantive prior-filed complaint simply because it was dashed off to court within twenty-four hours of the public disclosure of the allegedly non-public information. Although at some later stage a stay may be warranted either in deference to the prior-filed derivative action in Alabama or other related federal proceedings, the SLC has not convinced me that a stay is warranted now.

Nor do I believe that these actions should be stayed to give the SLC time to finish its investigation. Although the sensible general rule is that such a stay should ordinarily issue, these cases present a very unusual situation. Here, the undisputed facts make it clear that this court will never be able to defer to a decision by the HealthSouth SLC to terminate these actions. When combined with certain other circumstances, the SLC's strange conduct and troubling composition are – as described herein – too confidence-undermining for the SLC to meet the independence requirement of the *Zapata* standard. Therefore, it is evident that a stay would serve no rational purpose and should be denied.

## I. The Allegations of the Delaware Complaints

Plaintiff Edward R. Biondi filed the first of the derivative complaints addressed in this decision on September 13, 2002.

In his complaint, Biondi spelled out with specificity both the nature of the claims he sought to press on behalf of HealthSouth and the reasons why demand on the HealthSouth board would have been futile. A second complaint was filed in this court by another plaintiff on October 8, 2002. Because Biondi's complaint was filed first and has more flesh on its bones, I refer to it – in its amended form – singularly as the

Delaware Complaint. The Delaware Complaint was amended on November 1, 2002 and simply added further detail and clarification to an already thorough original complaint.

Although the Delaware Complaint is detailed, its central allegation can be summarized succinctly as follows. HealthSouth is a health corporation that runs hospitals and other health care facilities. As a result, HealthSouth earns a large portion of its revenue through health services that are ultimately paid for by the federal government, through programs like Medicare and Medicaid. Therefore, the level of payment these programs will make for certain services is very important to HealthSouth's bottom line. Relatedly, because these federal programs are extremely important in the overall American health care market, their reimbursement policies tend to influence private payors' policies towards reimbursement.

One of the federal reimbursement policies important to HealthSouth deals with the level of reimbursement to be granted for therapy services when a professional treats two or more patients with the same condition during the same time period, regardless of whether the therapy sessions are separate. In the Delaware Complaint, it is alleged that the Centers for Medicare and Medicaid Services ("CMS") had for the past two years given guidance that Medicare would soon reimburse a provider only for a group therapy rate for such services, rather than a higher individual therapy rate. In the face of this guidance about CMS's new position – what I will call the Group Rate Policy – HealthSouth continued to seek reimbursement at the higher individual rate for these therapy services and to base its forward-looking earnings estimates on the assumption that it would continue to receive individual rate reimbursement.

Since at least summer 2001, the complaint alleges, HealthSouth's board and key officers possessed information that CMS would eventually refuse individual rate reimbursement to HealthSouth under the Group Rate Policy and thereby materially lower the company's earnings. While possessing that information, however, the HealthSouth board continued to issue rosy earnings projections, based on contrary assumptions. Even worse, say the Delaware plaintiffs, members of the board sold large blocks of HealthSouth shares into a marketplace unaware of the profoundly negative effect the CMS's proposed reimbursement policy would have on HealthSouth. To wit:

- Defendant C. Sage Givens, who is a HealthSouth director, sold 160,000 shares in August 2001 at prices in excess of $17 per share, yielding $2.85 million.
- Defendant Charles W. Newhall III, who is a HealthSouth director, sold 165,000 shares in December 2001 at over $14 a share, reaping proceeds of $2.33 million.
- Defendant Richard M. Scrushy, who at that time was HealthSouth's Chairman, CEO, and director, exercised options for nearly 5.3 million shares and sold them to the public at approximately $14 a share on May 14, 2002, receiving proceeds of over $74 million.

On May 17, 2002, CMS issued a specific directive (the "Directive") implementing its Group Rate Policy, effective July 1, 2002. According to the plaintiffs, HealthSouth did not disclose this development to its stockholders or, as important, explain what effect the Directive would have on the company. The Delaware Complaint alleges that two members of the HealthSouth board, however, did take action knowing about the Directive. That action was to

engage in the following sales of Health-South stock:

- In June 2002, defendant George H. Strong, who is a HealthSouth director and former CEO of a large health insurer, sold over 185,000 shares at $14 a share, earning nearly $2.6 million.

- On July 31, 2002, Scrushy sold over 2.5 million HealthSouth shares at a price of around $10 a share, which yielded Scrushy over $25 million he could use to repay a loan to the company. This transaction occurred under a company loan program, by which Scrushy's loan was collateralized by HealthSouth stock he had received as compensation. Scrushy had the option to pay back the loan by selling these shares in the market, or at the company's option, back to the company itself. The Health-South board chose to exercise the option to buy the stock back itself. For case of reference, I refer to this transaction as "the Buyback."

On August 27, 2002, HealthSouth announced a few important items, including the spin-off of one its units, with Scrushy yielding his position as CEO to his fellow director and management subordinate, William T. Owens. Scrushy retained his position as Chairman of HealthSouth and was to become Chairman of the spun-off company.

Most important for the purposes of this case, however, was HealthSouth's announcement that the CMS's Group Rate Policy would reduce the company's earnings before interest, taxes, depreciation, and amortization by $175 million annually. Within two days of this announcement, the price of HealthSouth shares dropped nearly 50%. The Delaware Complaint alleges that the spin-off was not wholly unrelated to the problems caused by the Group Rate Policy. Rather, they contend that the spin-off was cooked up in haste, as a method of distracting the market's attention from the adverse impact of the Group Rate Policy.

The Delaware Complaint named each of HealthSouth's nine directors as defendants. That complaint alleged that the HealthSouth directors who sold stock while aware of CMS's proposed Group Rate Policy had breached their duty of loyalty to the company. Relatedly, the complaint also alleges that Scrushy and Strong improperly received excess compensation under their employment contracts because they received incentive bonuses based on the false assumption that the company could continue to receive individual rate reimbursement for services covered by the Group Rate Policy of CMS. Furthermore, the complaint alleges that the HealthSouth board breached its fiduciary duties by choosing to buy back Scrushy's shares for $10 a share when they knew that the Group Rate Policy would adversely affect HealthSouth's earnings when it went into effect and the company's stock price when that reality became public. More generally, the complaint alleges that the board breached its duties by its purposely disloyal, or at the very least, reckless management of the Group Rate Policy's effect on Health-South, and the company's reaction to that Policy, both in terms of disclosure and in terms of the trading behavior of board members and other company insiders.

Finally, the Delaware Complaint contained numerous allegations of fact designed to show that the HealthSouth board could not impartially consider a demand. These allegations of fact are indicative of careful factual research, motivated by an appreciation for the standards that govern the procession of derivative claims under Delaware law.

## II. *The "Tucker" Action in Alabama*

The derivative complaint, which the SLC alleges is first-filed, was filed by Wade Tucker on August 28, 2002 in the Circuit Court for Jefferson County, Alabama (the "Tucker Complaint" or "Action"). By contrast to the Delaware Complaint, the original Tucker Complaint touched only briefly on the Group Rate Policy and its relationship to the trading of the HealthSouth board members.

In that respect, the Tucker Complaint did not challenge any sale of stock by any HealthSouth director other than Scrushy. As to Scrushy, the original Tucker Complaint only challenged the Buyback in which he sold 2.5 million shares back to HealthSouth. Although it is true that the original Tucker Complaint averred that the transaction was unfair in part because CMS had adopted its Group Rate Policy, it did so in a cursory fashion. Indeed, the substantive claim pled as to that transaction was based solely on a theory of corporate waste.

None of the other HealthSouth directors were even named as defendants. Although the original Tucker Complaint named as "fictitious defendants" the board members who were in office at the time of the transactions complained of in that complaint, it did not identify them by name, despite the fact that HealthSouth is a public company that must disclose the identity of its directors.

Read fairly, the Tucker Complaint is a wide-ranging challenge to various transactions between HealthSouth and defendant Scrushy, with the general theme that Scrushy was able to extract excessive compensation and use HealthSouth to participate in ventures that were valuable to him personally. According to the SLC, some of the transactions challenged in the Tucker Complaint date back a decade. The original Tucker Complaint named

Scrushy's brother, Gerald P. Scrushy, a HealthSouth officer, as an identified co-defendant.

A close reading of the original Tucker Complaint gives rise to an obvious inference: that complaint had been in the works for some time and was about to be filed when HealthSouth made its announcement regarding the effect of the Group Rate Policy. Rather than take the time to actually write a substantive complaint about that new matter, Tucker's lawyers simply added a sentence or two to their pre-existing draft attacking the Buyback and filed it. That is, the claim regarding the Buyback was an afterthought wholly incidental, rather than fundamental, to the other claims pled.

Notably, the original Tucker Complaint did not make any serious effort to plead facts that would excuse demand on the HealthSouth board, despite the derivative nature of the claims he attempted to plead. Under Delaware case law, it is difficult to plead demand futility by filing a complaint that only identifies one of the nine directors and that does not attempt to plead breach of fiduciary duty on a particularized basis.

On November 15, 2002 – after Tucker had agreed to stay his case in deference to the SLC's investigation – the Tucker Complaint was amended. The amendment added claims challenging the sale of HealthSouth shares by Scrushy in May 2002 and by Strong in June 2002, and it also broadened the basis for the challenge to the Buyback to include allegations more like the ones advanced in the Delaware Action. The Tucker Complaint was also amended so that for the first time all nine of HealthSouth's directors were identified by name.

Even with the amendment, however, the Tucker Complaint does not plead demand

excusal with any specificity, does not challenge all of the sales attacked in the Delaware Complaint, and does not allege facts regarding the challenged sales of Health-South with the same kind of thoroughness as the Delaware Complaint does.

### III. The Status of the Tucker Action and the Other Alabama State Court Actions

Other actions related to the Delaware Action and the Tucker Action are pending. In Alabama state court, three other derivative suits were filed after the Tucker Action. These make allegations substantively similar to those made in the Delaware Action, but, like the Tucker Complaint, did not make nearly as much of an effort to plead demand excusal. Each of these suits was filed after the first complaint in the Delaware Action. All of the derivative suits in the Alabama courts were temporarily consolidated and stayed, pending briefing on the SLC's motion for a stay until its investigation is completed. The Tucker plaintiffs had agreed to consent to the SLC's motion for a stay in spite of some unusual facts regarding the HealthSouth SLC (which will be discussed shortly), but some of the other plaintiffs in other cases did not and demanded time to brief the issue adversarially.

On December 18, 2002, the Alabama Circuit Court issued an order addressing the issues raised by that briefing.[2] In that decision, that Court held that the Tucker Complaint was the first-filed case among the derivative actions pending there and that the amendments to the original Tucker Complaint related back to the date of the original filing. In so ruling, the Court rejected the arguments made by the later-filing plaintiffs that the original Tucker Complaint's failure to identify specifically the directors other than Scrushy, or to identify transactions other than the Buyback for challenge, precluded relation back. Pursuant to an Alabama statute, the Court "abated," i.e., dismissed without prejudice, all of the later-filed derivative actions, leaving only the Tucker Complaint standing.

The Court then stayed the Tucker Action, pending the completion of the SLC's investigation. As noted, it did so with the consent of Tucker himself, but over the objection of some of the later-filing plaintiffs whose complaints were abated. In so ruling, the Court adhered to the general rule in Delaware that any challenge to the independence of a special litigation committee should await the filing of its report. The Court did not address the specific arguments the later-filing plaintiffs made regarding the HealthSouth SLC's ability to act impartially but said that those issues were only relevant after the SLC had reported its findings. The Court stayed the action for four months but gave the SLC the right to petition for more time if necessary to complete its investigation.

### IV. The Federal Securities Actions

On August 28, 2002 – the day that the original Tucker Complaint was filed – the first of seventeen shareholder class actions were filed against HealthSouth and certain of its directors in the United States District Court for the Northern District of Alabama. Each of these suits (the "Federal Securities Complaints") attacks the sales of HealthSouth stock by company insiders during the period in which it is alleged that they knew that the Group Rate Policy would adversely affect Health-South but before Health South disclosed

2. Tucker v. Scrushy, C.A. No. CV–02–5212, order (Ala. Cir. Ct. of Jefferson County Dec. 18, 2002).

those effects to the market. In particular, the complaints allege a violation of Securities Exchange Act § 10(b) and Securities and Exchange Commission Rule 10b–5, as well as § 20(a) of the Exchange Act. All of the Alabama Federal Actions have been consolidated before Judge Karon O. Bowdre, and that court is now considering the appointment of lead counsel.

## V. *The Creation of the HealthSouth Special Litigation Committee*

On September 17, 2002, the HealthSouth board formed the Special Litigation Committee. The board did so by a series of resolutions that are confusing. The basic charge of the SLC was set forth as follows:

> the Board of Directors hereby constitutes and appoints a Special Litigation Committee ... to investigate, review and analyze: (1) the facts, transactions, events and circumstances surrounding the claims made in such Tucker Action and any other actions or proceedings which may be filed which relate or are alleged to relate to any event or transaction which is a subject in or of the Tucker Action; and (2) to the extent the Business Judgment Rule may be determined to be applicable thereto or to the extent claims of a derivative nature may be asserted in respect thereto, any events or transactions which are or may become the subject of any of the pending federal court class actions which have been filed against the Company since August 27, 2002 in the United States District Court for the Northern District of Alabama.[3]

Furthermore, the SLC was given the mandate to:

> [c]onsider and determine whether or not prosecution or continuation of such claims and actions is in the best interests of the Company and its shareholders, and what action the Company should take with respect thereto ...
>
> [h]ave and may exercise in connection with its investigation and determination all the powers and authority of the Board of Directors, which is hereby delegated to the Committee, and such other powers as are accorded to a committee under applicable law ...[4]

This delegation of power to the SLC was clear enough and in accordance with expected practice. The problem is that the board further resolved that nothing in its empowerment of the SLC was:

> intended to moot or waive the Company's planned motions to dismiss or stay the Tucker Action for lack of standing and/or failure to state a claim upon which relief may be granted and failure to comply with the requirements of Rules 12(b)(6) and 23.1, Alabama Rules of Civil Procedure; provided, however, that the Committee should have full power and discretion *to recommend* that any Company motion or pleading be changed, withdrawn, or supplemented by additional or substituted pleadings or motions of the Committee or the Company, or both, as shall be deemed appropriate ...[5]

Read plainly, this resolution seemed to limit the SLC's authority to prevent the company from seeking dismissal of the Tucker Action, with or without the SLC's blessing. Although the SLC could "recommend" otherwise, nothing in the prior resolution authorizing the SLC to act for the board was "intended to moot or waive" the company's planned motions for dis-

---

3. Bouchard Aff. Ex. L.

4. *Id.*

5. *Id.* (emphasis added).

missal.[6] This intent is further demonstrated by earlier language in the resolutions that indicated the board's desire "to preserve to the Company and the Board" the right to seek dismissal.[7]

To confuse matters further, however, the board also resolved that the "determinations made by the [SLC] shall be final, shall not be subject to review by the Board of Directors and shall in all respects be binding upon the Company . . ."[8]

As the Delaware Complaint argues, the SLC's original mandate was not as clear as one would hope. The Delaware plaintiffs contend that the SLC was left without full power to control HealthSouth's reaction to the litigations and most notably could not prevent the "Company and the Board" from pursuing dismissal of the suits over the SLC's "recommend[ation]."[9]

In an attempt to dispel these concerns, HealthSouth amended its SLC's charge *in advance of the SLC's filing of its reply brief.* The amendment clarifies the SLC's authority to act fully for HealthSouth and deletes the references to the company's independent ability to file dismissal or stay motions.

This late amendment, however, addresses but one of the facts that the Delaware plaintiffs point to support their argument that the HealthSouth SLC is fatally compromised. I now describe the others.

## VI. *The Strange Early Days of the HealthSouth SLC*

One of the obvious purposes for forming a special litigation committee is to promote confidence in the integrity of corporate decision making by vesting the company's power to respond to accusations of serious misconduct by high officials in an impartial group of independent directors. By forming a committee whose fairness and objectivity cannot be reasonably questioned, giving them the resources to retain advisors, and granting them the freedom to do a thorough investigation and to pursue claims against wrongdoers, the company can assuage concern among its stockholders and retain, through the SLC, control over any claims belonging to the company itself.

Critical to the accomplishment of these objectives, however, is the proper composition and empowerment of the committee. If a special litigation committee is comprised of directors with compromising ties to the key officials who are suspected of malfeasance, if the committee is not fully empowered to act for the company without approval by the full board, or if the committee behaves in a manner inconsistent with the duty to carefully and open-mindedly investigate the alleged wrongdoing, its ability to instill confidence is, at best, compromised and, at worst, inutile.

Regrettably, the HealthSouth SLC's early days involved several confidence-shaking events.

They begin with the composition of the SLC itself. When first formed, the SLC was to be comprised of an existing HealthSouth director, Larry D. Striplin, Jr., and a newly appointed director, Jon Hanson. Of course, one of the key reasons for the formation of a special litigation committee is to insulate the company's decision making process from the influence of those under suspicion. In this matter, Scrushy is the key target of all the lawsuits alleging improper trading in advance of the compa-

6. *Id.*

7. *Id.*

8. *Id.*

9. *Id.*

ny's disclosure of the impact of the Group Rate Policy.

The selection of Striplin and Hanson to comprise the SLC was thus somewhat surprising. Both of them serve with Scrushy on the board of the National Football Foundation and College Hall of Fame, Inc., *of which Hanson has been the Chairman since 1994*. One of that organization's key awards is named for Health-South, suggesting that the company, under Scrushy's managerial leadership, has been quite generous with a cause very important to Hanson. Contributing to the disquiet is the long-standing personal ties between Striplin and Scrushy, who are both large contributors to college sports programs in Alabama. Indeed, a stadium at a college in Alabama is named Scrushy–Striplin Field.

The same day that the SLC was created with this questionable membership, HealthSouth took another action that further undercut the SLC's credibility. For one thing, HealthSouth hired the law firm of Fulbright & Jaworski L.L.P. to investigate the securities trading issues that were at the heart of the pending lawsuits – *i.e.,* the same issue supposedly entrusted to the SLC. The retention of Fulbright & Jaworski was announced on the same day as the SLC was formed.

Just six days later, HealthSouth put out a press release, which quotes company director and Scrushy's new successor as CEO, William Owens, to the following effect:

> I want to make it clear that Richard M. Scrushy had absolutely no knowledge about any change in Medicare reimbursement rules until August 6, 2002, and none of us had any knowledge whatsoever that a possible rule change would

have a material, financial impact on our company until August 15, 2002.[10]

This statement was rather unusual, coming from the CEO of a company that had just chosen to form the SLC to investigate, among other things, the very question of whether Scrushy and other HealthSouth insiders had traded improperly while recognizing the adverse effect the Group Rate Policy would have on the company.

The next development came on October 1, 2002 when HealthSouth announced the election of Robert P. May to the board as a putatively independent director. May soon became Chairman of the SLC. A few days thereafter, SLC member Striplin resigned in the face of press reports questioning his ability to serve impartially, especially in view of a large contract that his glass company had recently received from HealthSouth. When he resigned, Striplin was publicly quoted issuing this strong statement supporting Scrushy: "He is a great leader doing a great job. Find another health care company that has done what HealthSouth has done." [11]

The next eyebrow-raising event occurred on October 30, 2002. HealthSouth issued a press release entitled:

**HEALTHSOUTH Chairman Richard Scrushy Cleared By Outside Investigation Of Advance Knowledge Of Medicare Rule Change Prior To Stock Transactions** [12]

The body of the release said that Fulbright & Jaworski had issued a report stating that Scrushy had "no knowledge of any Medicare reimbursement rule change or its financial impact on the Company until two months after he sold stock on May 14 due to expiring stock options and a

---

10. Brown Aff. Ex. N.

11. Brown Aff. Ex. E.

12. Brown Aff. Ex. U (emphasis in original).

week after he repaid a stock loan on July 31."[13] As mentioned earlier, Fulbright & Jaworski did not work for the SLC, which was only in the early stages of its own work.[14]

*Despite those important facts, SLC Chairman May was quoted in the Health-South press release to this effect:*

This thorough outside review conducted by Fulbright & Jaworski puts to rest any question whether Mr. Scrushy had any inkling or knowledge of the Medicare reimbursement rule change or its impact prior to his stock transactions in May and July 2002.[15]

Soon after HealthSouth's release trumpeting the exonerating effect of the Fulbright & Jaworski report, the company was forced to issue another disclosure. Fulbright & Jaworski was apparently uncomfortable with the company's initial release. Although the Fulbright & Jaworski report apparently uncovered "no oral interview or written document"[16] that established that Scrushy was aware of the effect of the Group Rate Policy at the time of his May trade and the July Buyback, the firm was expressing "no views as to the inferences that may be drawn from the facts and circumstances" in that report.[17]

## VII. *Legal Analysis*

The SLC seeks a stay or dismissal of the Delaware Action on two independent grounds. Initially, the SLC contends that stay or dismissal of the Delaware Action is warranted under the *McWane*[18] doctrine because the Tucker Action is a first-filed case pending in a court that can do prompt and adequate justice to the claims pled in the Delaware Action. Secondarily, the SLC contends that the Delaware Action should be stayed to permit it to finish its investigation. Such a stay, the SLC argues, is mandated under *Zapata*[19] and its progeny.

I address these arguments in turn.

### A. *Should the Delaware Action Be Stayed in Deference to the Tucker Action?*

The application of the *McWane* doctrine to representative actions – *i.e.*, class and derivative actions – is troublesome. In that context, the *McWane* doctrine is both most useful and most difficult to apply. Representative actions present the greatest chance for identical claims to be presented to multiple courts at the same time. Hence, there is utility to a legal rule of decision that promotes comity and judicial economy by reducing the likelihood for duplicative effort and unseemly wrestling

13. *Id.*

14. Only seven days before, the SLC's counsel had written to the plaintiffs in the Delaware Action asking for suggestions "with respect to the scope and substance of the Committee's work." Brown Aff. Ex. W. The letter asked for a reply within two to three weeks. *Id.* Counsel for Delaware plaintiff Biondi replied in a detailed letter on November 8, 2002. According to the Delaware plaintiffs, they have not heard further from the SLC.

15. *Id.* In its reply brief, the SLC does not deny that May made this statement but attempts to slight it as a "statement attributed to him in a press release." SLC Reply Br. at

28. That response is weak tea. The press release was put out by HealthSouth itself, May has not filed any affidavit denying the statement, and there is no evidence that HealthSouth ever issued a retraction on his behalf.

16. Brown Aff. Ex. U.

17. Brown Aff. Ex. Y; Brown Aff. Ex. V.

18. *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.*, 263 A.2d 281 (Del.1970).

19. *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.1981).

over which forum should take hold of a matter. At the same time, representative actions pose certain dangers – in particular, the potential divergence in the best interests of the plaintiffs' attorneys and the plaintiffs they are purporting to represent – that are not addressed, and indeed may be exacerbated, by a legal rule that places determinative weight on which complaint was filed first.[20]

■ Because of these competing considerations, this court has proceeded cautiously when facing the question of whether to defer to a first-filed representative action and has given much less weight to first-filed status than is required in the non-representation action context.[21] In particular, that caution has been motivated by a concern that the underlying client in interest in a representative action – the class or, in the case of a derivative action, the corporation – be represented effectively and faithfully. The mere fact that a lawyer filed first for a representative client is scant evidence of his adequacy and may, in fact, support the contrary inference.

For those reasons, this court will not grant a stay simply because there is a prior-filed representative action in a court capable of doing prompt and complete justice. Instead, the court will examine more closely the relevant factors bearing on where the case should best proceed, using something akin to a *forum non conveniens* analysis.[22]

This does not mean that the question of first-filed status is irrelevant. Rather, it means that the first-filed factor typically becomes decisively important only when: (1) a consideration of other relevant factors does not tilt heavily in either direction and there is a need for an objective tiebreaker to promote comity and assure litigative efficiency or (2) the court is assured by virtue of a judicial finding in the first-filed representative action (through a class certification ruling under Rule 23 or selection of lead counsel under the Private Securities Litigation Reform Act of 1995) or other record evidence that the plaintiffs in the action for which a stay was sought are adequately represented in the first-filed action.[23]

20. *See generally Silverstein v. Warner Communications, Inc.*, 1991 WL 12835 (Del.Ch. Feb.5, 1991); *Jim Walter Corp. v. Allen*, 1990 WL 3899 (Del.Ch. Jan.12, 1990).

21. In this regard, it is noteworthy that *McWane* itself did not involve a representative action and was concerned with preventing defendants from defeating "the plaintiff's choice of forum in a pending suit by commencing litigation involving the same cause of action in another jurisdiction of its own choosing ..." *McWane*, 263 A.2d at 283. This context raises the question of whether the determination of who gets to represent a party that does not have the ability to choose its own counsel should be governed solely by whoever files the first complaint, regardless of the quality and substance of that pleading.

22. Cases involving multiple representative actions, i.e. class or derivative actions, filed in more than one forum, do not present the same forum selection issues as ... addressed in *McWane*. Where one person seeking to act

in a representative capacity chooses to litigate in Delaware and another in a different forum, there is little reason to accord decisive weight to the priority of filing, at least where no prejudicial delay has occurred. Other factors bearing on the convenience of the parties and the interests of Delaware in resolving the dispute will be more important.

*Dura Pharms. v. Scandipharm, Inc.*, 713 A.2d 925, 929 n. 1 (Del.Ch.1998); *see also Silverstein*, 1991 WL 12835, at *3 (discussing the preferable incentives created by utilizing a *forum non conveniens* test to a motion to stay); *Jim Walter Corp.*, 1990 WL 3899, at *4 ("[T]he more demanding test of *forum non conveniens* should be used to determine whether ... a stay should be granted.").

23. In this second circumstance, the countervailing policy considerations that weigh against the application of *McWane* in the representative action context are sufficiently addressed and, therefore, the *McWane* policy favoring easy deference to the first-filed com-

■ In this case, the SLC has not convinced me that first-filed status, without more, counsels in favor of an immediate stay. Read charitably, the original Tucker Complaint pled but one of the claims, as to only one of the transactions, addressed in the Delaware Complaint.[24] Even that one claim was pled cursorily and as an aside to a host of other broad-ranging and thinly-pled complaints about Scrushy's compensation from and management of Health-South. The Tucker Complaint did not even attempt to plead demand excusal with particularity.

By contrast, the Delaware Complaint dealt comprehensively with a series of trades and transactions by HealthSouth directors that the plaintiffs allege were consummated when the directors knew of the adverse effect the Group Rate Policy would have on HealthSouth, but the market did not. As important, the Delaware Complaint pled demand excusal with particularity.

Although I do not doubt the competence of the Alabama Circuit Court to handle the claims pled in the Delaware Complaint with skillful dispatch,[25] the reality is that deferring to the Tucker Action requires me to give determinative weight to a pleading that evidenced far more concern for speed in filing than adequacy of content. This is demonstrated by the original failure of Tucker to even identify the directors of HealthSouth other than Scrushy,[26] to attack any of the sales in HealthSouth stock made by other Health-South directors, or to challenge the Buy-back on grounds other than corporate waste. By contrast, the Delaware Complaint, although – or perhaps more accurately, *because* – it was filed two weeks later, is thorough and fact-laden, demonstrating that the plaintiffs' lawyers used the time between the announcement by

---

plaint should be used to determine the outcome of the stay motion. *See Derdiger v. Tallman,* 773 A.2d 1005, 1012–13 (Del.Ch. 2000) (when a federal court has appointed lead plaintiff in a first-filed federal class action after a careful process according with the Private Securities Litigation Reform Act, the concerns that typically counsel against the full-strength use of *McWane* in the representative action context were sufficiently addressed).

24. It is true, as the Alabama Circuit Court noted, that the original Tucker Complaint averred to other transactions "currently under investigation." *See* Bouchard Aff. Ex. C at ¶ 33. It did not do so in reference specifically to other trades that Scrushy or other HealthSouth directors might have made while knowing the effect of the Group Rate Policy. Rather, this general statement comes before the Buyback is even referred to in the original Tucker Complaint as part of a reference to an overall scheme involving years of preferential treatment of Scrushy. Under Delaware law – *i.e.,* the law applicable to the relevant claims – a derivative complaint challenging transactions "currently under investigation" would, of course, have no chance of survival and

tends, on its face, to admit of premature filing.

25. *E.g., Derdiger,* 773 A.2d at 1013 & n. 21 (citing cases illustrating this court's confidence that its sister federal and state courts can apply Delaware law capably).

26. Although the amended Tucker Complaint does identify the directors, it is not clear why that is confidence-inspiring. By the time of that amendment, Tucker had agreed to a stay *and had access to several other complaints that included this basic information.* Moreover, the original Tucker Complaint contains this sentence, which makes it impossible to know which of the unnamed directors was actually a target of Tucker's ire: "Although not named in this original complaint as individual defendants (except to the extent that they may be fictitious defendants), some of the board members are themselves some of the alleged wrongdoers ..." Bouchard Aff. Ex. C at ¶ 46. To this extent, the original Tucker Complaint was, according its own statements simply a placeholder for a later, more thoroughly researched complaint. *See also supra* note 24.

HealthSouth of the Group Rate Policy's effect and the filing of their complaint to perform diligent research.

■ Indeed, because the Tucker Action focused largely on other transactions and did not address most of the transactions contained in the Delaware Complaint, it is difficult to say that the original complaint in that case raised claims that were functionally identical to those raised in the Delaware Complaint, nor is it apparent that the parties are substantially the same,[27] given the failure of the original Tucker Complaint to plead claims against the other HealthSouth directors.[28] For those same reasons, it is not apparent why it should be influential in the representative action context that the later amended complaint in the Tucker Action added challenges to some, but not all, of the other sales attacked in the Delaware Complaint. The only transaction relevant to the Delaware Action that was challenged specifically in the original Tucker Complaint is the Buyback.[29] Because the amended Tucker Complaint alleged wholly new claims against defendants who were not even named in the original complaint in that case, the "what" and "who" of those claims were not presaged in any way by the text of the earlier complaint. Even as to Scrushy, the amended Tucker Complaint challenges an earlier stock sale that was not even mentioned in the original complaint, despite the practical requirement under Delaware law that derivative claims be pled with particularity.[30]

27. *Derdiger*, 773 A.2d at 1014 & 1016–18 (noting that exact identity of claims is not required in order to stay a later-filed action in favor of a first-filed action).

28. *See Derdiger*, 773 A.2d at 1013 (whether the cases involve the same parties is a relevant consideration). Although the Alabama Circuit Court found it proper, the original Tucker Complaint's use of fictitious names, at the very least, raised a litigable question under Alabama Rule of Civil Procedure 9(h). *See Davis v. Mims*, 510 So.2d 227, 229 (Ala. 1987). As admitted by the text of original Tucker Complaint, *see supra* note 24, the HealthSouth directors (all of whose identities were publicly available) other than Scrushy could not tell whether they were targets of Tucker's ire or for what reason they drew that ire.

29. I acknowledge that the Alabama Circuit Court held that the amended Tucker Complaint's allegation challenging Scrushy's sale of stock in May 2002 – a transaction never mentioned in the original complaint – nevertheless related back. I have no reason to question this conclusion of Alabama law and do not make any contrary finding. *But see* Ala. R. Civ. P. 15(c) (no relation back under Alabama if claim does not arise out of conduct, transaction, or occurrence pled in the original complaint); *Ga. Cas. & Sur. Co. v. White*, 582 So.2d 487, 492 (Ala.1991) (same); *Carter v. Liberty Nat'l Life Ins. Co.*, 2002 WL

31528766, at *5 (Ala.Civ.App. Nov.15, 2002) (same); *cf.* Ch. Ct. R. 15(c) (same rule under Delaware law); *Mullen v. Alarmguard of Delmarva, Inc.*, 625 A.2d 258, 264 (Del.1993) (same). I simply note that even *McWane* calls for an exercise of judicial discretion and not a reflexive deference to the first piece of paper filed that relates to the claims pled in a later-filed action. *McWane*, 263 A.2d at 283 (noting that the issue of whether a stay should be granted remained a discretionary one and that "each case must be considered on its own merits"). Even if Alabama law permits a claim such as the original Tucker Complaint to be broadly read for purposes of its Rule 15(c), the more important public policy encouraging the filing of carefully researched derivative complaints on behalf of Delaware corporations demands that rapidly pled "placeholder" complaints are not rewarded by being accorded deference solely on the basis that they were filed first. The substantive interest of Delaware in ensuring that the protections of its corporate laws are afforded to stockholders of Delaware corporations is a weighty one that trumps the procedural force of civil procedure relation-back principles.

30. If a complaint does not plead board bias sufficiently to satisfy the first prong of *Aronson*, which the Tucker Complaint did not even attempt to do, the fiduciary duty claims in the complaint can only survive if they are pled with particularity. *Aronson v. Lewis*, 473 A.2d 805, 814–15 (Del.1984).

In concluding that it would be inappropriate to stay the Delaware Action at this time, I am particularly mindful of the Delaware Supreme Court's repeated admonitions to derivative counsel to undertake diligent research before filing their complaints. These admonitions reflect the important value our state places on the enforcement of the legal and equitable duties of directors of Delaware corporations.[31] By investing in a corporation chartered in Delaware, stockholders seek out and are entitled to the protections afforded by our law. As a practical matter, these protections are often assured by the filing of representative actions like this one, making it important that the quality of representation afforded by plaintiffs' counsel in these cases be high. The importance of quality lawyering at the pleading stage of derivative cases is obvious, given the higher pleading burdens applicable to derivative complaints. For this reason, Delaware law places more emphasis on quality than speed when assessing derivative complaints.

As our high court noted in *Rales v. Blasband*:

> Surprisingly, little use has been made of section 220 as an information-gathering tool in the derivative context. Perhaps the problem arises in some cases out of an unseemly race to the court house, chiefly generated by the "first to file" custom seemingly permitting the winner of the race to be named lead counsel. The result has been a plethora of superficial complaints that could not be sustained. *Nothing requires the Court of Chancery, or any other court having appropriate jurisdiction, to countenance this process by penalizing diligent counsel who has employed these methods, including section 220, in a deliberate and thorough manner in preparing a complaint that meets the demand excused test of* Aronson.[32]

Or, in Chancellor Chandler's words:

> Too often judges of this Court face complaints filed hastily, minutes or hours after a transaction is announced, based on snippets from the print or electronic media.... It is not the race to the courthouse door, however, that impresses the members of this Court when it comes to deciding who should control and coordinate litigation on behalf of the shareholder class. In fact, this Court and the Delaware Supreme Court have repeatedly emphasized the importance of plaintiffs' counsel taking the time to use the "tools at hand" ... to develop a record sufficient to craft pleadings with particularized factual allegations necessary to survive the inevitable motions to dismiss.[33]

Because of this factor, Chancellor Chandler advocated that more substantive factors be given greater weight in the determination of whether a stay should issue including, "the quality of the pleading that appears best able to represent the interests of the shareholder class and derivative plaintiffs." [34]

The public policy interest favoring the submission of thoughtful, well-researched complaints – rather than ones regurgitating the morning's financial press – would be disserved by granting a stay in this case.

**31.** *See, e.g., Sternberg v. O'Neil,* 550 A.2d 1105, 1123–25 (Del.1988).

**32.** 634 A.2d 927, 935 n. 10 (Del.1993) (emphasis added).

**33.** *TCW Tech. Ltd. P'ship v. Intermedia Communications, Inc.,* 2000 WL 1654504, at *3 (Del.Ch. Oct.17, 2000) (footnote omitted).

**34.** *Id.* at *4.

That said, I am equally mindful of the need for comity with our sister state and federal courts, as well as the practical reality that identical derivative claims should not be tried in separate forums. At a later stage, the question of where the claims raised in the Delaware Action should proceed can be revisited, and I am confident that an efficient and fair resolution to the forum issue can be forged, with cooperation among the litigating parties and among the affected courts. In this respect, one final note is advisable.

In its opening papers, the SLC did not ask me to stay the Delaware Action in favor of the Federal Securities Actions.[35] Because the Delaware Action largely involves claims that are substantively indistinguishable from federal insider trading claims, it may well be that the federal adjudications should precede the determination of the state law issues and that any schedule in this case should reflect that consideration. Although in one important respect there are state law issues that diverge to some extent from the basis for the federal suits – i.e., the question of whether the Buyback was an unfair interested transaction under state law – in most respects it would seem to be helpful to have a prior federal adjudication of whether the trading directors possessed material, non-public information at the time of their trades and acted with *scienter*.

For now, however, I simply deny the SLC's application for a stay in deference to the Tucker Action, without prejudice to a later, similar motion.

**B. *Should This Action Be Stayed Until the SLC's Completes Its Investigation?***

The SLC next contends that a stay must be granted to permit it to finish its investigation without the distraction and costs that would occur if this litigation proceeds at the same time. In support of that proposition, the SLC cites hornbook Delaware law, including this statement from the case of *Abbey v. Computer & Communications Technology Corp.*:

> If *Zapata* is to be meaningful, then it would seem that such an independent committee, once appointed, should be afforded a reasonable time to carry out its function. It would likewise seem reasonable to hold normal discovery and other matters in abeyance during this interval. If a derivative plaintiff were to be permitted to depose corporate officers and directors and to demand production of corporate documents, etc. at the same time that a duly authorized litigation committee was investigating whether or not it would be in the best interests of the corporation to permit the suit to go forward, the very justification for the creating of the litigation committee in the first place might well be subverted.[36]

The Delaware plaintiffs admit that the general rule under Delaware law is that a stay must be granted when a special litigation committee is formed to consider whether derivative actions should be prosecuted.[37] But they argue that even a

---

35. The SLC did raise this issue in its reply papers, but its opening brief only asked for a stay in favor of a singular "prior-filed Tucker Action." SLC Opening Br. at cover page & 18.

36. 457 A.2d 368, 375 (Del.Ch.1983); *see also Kaplan v. Wyatt*, 484 A.2d 501, 510 (Del.Ch. 1984), *aff'd*, 499 A.2d 1184 (Del.1985).

37. Other cases to this effect include: *In re Oracle Corp. Derivative Litig.*, 808 A.2d 1206, 1210–11 & n. 16 (Del.Ch.2002); *Katell v. Morgan Stanley Group, Inc.*, 1993 WL 390525, at *4 (Del.Ch. Sept. 27, 1993); *Pompeo v. Hefner*, 1983 WL 20284, at *2–*3 (Del.Ch. Mar. 23, 1983).

sound general rule must admit of exceptions in compelling circumstances, which include a situation when it is clear that the special litigation committee in question can reach only one determination – a decision that the derivative suit should be prosecuted – that has a chance of being accorded deference under the test set forth in *Zapata Corp. v. Maldonado.*[38]

 As a prerequisite to determining whether to defer to the business judgment of a special litigation committee to terminate a derivative suit, a court must conduct an inquiry into the "independence and good faith of the committee and the bases supporting its conclusions."[39] The court may defer to the committee's recommendation to terminate so long as that committee proves that its members: (1) were independent; (2) acted in good faith; and (3) had a reasonable basis for their conclusions.[40] Ordinarily, and for obvious reasons, the inquiry whether the SLC's recommendation should be respected is usually made after the committee has·concluded its investigation and issued its report. In the meantime, when the committee asks for a stay to give itself breathing room to do its job without distraction from the underlying litigation's procession, the court almost invariably grants the motion.

One of the obvious reasons for this normal practice is that in most cases a facial attack on the independence of the special litigation committee at the time of the stay application would be futile. After all, the purpose of forming a special litigation committee is to entrust the fate of the lawsuit to directors whose impartiality cannot reasonably be questioned. Thus, good corporate practice involves the selection of special committee members who would be characterized as *prima facie* independent if that issue was relevant to, for example, a motion to dismiss under Court of Chancery Rule 12(b)(6) or Rule 23.1. Moreover, even if the *prima facie* independence of the special litigation committee is a litigable issue, judicial economy is served by permitting that issue to be addressed after the committee has issued its report, because the court may then consider questions of committee independence at the same time it examines the reasonableness of the bases for the committee's conclusion.[41] Therefore, if there is any litigable doubt about whether a special litigation committee will ultimately be found capable of independently issuing a report recommending the termination of derivative litigation that will command deference under *Zapata*, the court should stay the litigation for a reasonable period of time to permit the committee to finish its work.

---

**38.** 430 A.2d 779 (Del.1981).

**39.** *Id.* at 788.

**40.** *See id.* at 788–89. Even if a special litigation committee proves these factors to the court's satisfaction, the court may, in its discretion, exercise its own judgment regarding whether the suit should proceed. *See id.* at 789. Although this is said to be an oxymoronic judicial exercise of "business judgment," its purpose is to provide a safeguard against the danger that the difficult-to-detect influence of fellow-feeling among directors (*i.e.,* so-called "structural bias") does not cause cessation of meritorious litigation valuable to the company.

**41.** In *Pompeo v. Hefner,* 1983 WL 20284, the plaintiffs argued that a stay motion should be denied because the special litigation committee had been appointed by the wrongdoers under investigation. The court rejected that argument, which, if adopted, would tend to denude the special litigation committee concept of all utility. In so doing, the court adhered to the view that the appropriate time to evaluate the committee's independence is after it files its report. I agree with *Pompeo* that this is the general rule, which should give way only in highly unusual circumstances such as those present here.

One can readily agree with these principles and still find appeal in the Delaware plaintiffs' argument that a stay should not be granted when it is apparent, based on the undisputed facts in the record at the time of the stay motion, that the special litigation committee does not satisfy the *Zapata* requirement of independence. Put differently, it would be futile and wasteful to issue a stay when the undisputed facts will make it impossible for the court later to accept a decision of the special litigation committee to terminate the derivative litigation because the committee will not be able to satisfy its burden under *Zapata* to show that it exercised an independent business judgment.

■ I agree with the Delaware plaintiffs that the general rule that a stay should issue is subject to exception in an atypical case when, based on the undisputed facts in the stay motion record, the committee's later decision to terminate the litigation could not command respect under *Zapata*. I also agree with the plaintiffs that this case warrants the application of that very narrow exception.[42]

The case presents an odd confluence of unusual and highly troubling facts. Taken together, these undisputed facts convince me that the HealthSouth SLC could not meet its burden to prove independence, if it eventually decided to seek termination of this action and the other pending derivative actions. If the only question about the SLC's independence was whether SLC member Hanson's service as Chairman of the National Football Foundation and College Hall of Fame, Inc. alongside Scrushy, a fellow director and benefactor of that

institution, compromised his independence, I would not deny a stay but would allow that question to be litigated after the SLC reported.

Combine that fact with the, at best, begrudging and, at worst, inadequate, original delegation of authority to the HealthSouth SLC, a delegation that left the board litigating to dismiss the derivative suits at the same time as the SLC was supposedly considering their merits. Even then, I still would not have denied a stay, especially given the (albeit very late) clarification of the SLC's authority by the HealthSouth board.

Take those factors and add the strange decision of the company to retain Fulbright & Jaworski to conduct an investigation in advance of the SLC and under the purview of the whole board. Then add the company's new CEO's (defendant Owens's) decision to trumpet the Fulbright & Jaworski report as exonerating and to use it as a reason to proclaim his confidence in the innocence of Scrushy, only to have the Fulbright & Jaworski firm undercut that interpretation of its findings. At that point, is there still an argument for a stay? But go further and heap on top of that the resignation of SLC member – and fellow National Football Foundation and College Hall of Fame director Striplin – in the face of public pressure and Striplin's parting public statement that Scrushy did nothing wrong. Would that have broken the camel's back? Who knows? It does not matter.

Because there is one fact alone that would warrant denying a stay and that, in combination with these other factors,

---

42. This is not the first case denying a stay application by a special litigation committee. In *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, 1996 WL 33167168 (Del.Ch. June 6, 1996), Chancellor Allen denied a stay because the committee's motion came well after substantial discovery and heated motion practice had already taken place. *See id.* at *2 & *9–*10. Although it involved a much different context, the *Carlton* ruling does demonstrate that the general rule favoring stays admits of limited exceptions.

makes the denial of a stay an easy call: the public announcement by the SLC's Chairman, director May, of his opinion that the Fulbright & Jaworksi report vindicated Scrushy. This extraordinary announcement came at a time when the SLC's own investigation was just getting underway.

*Zapata* presents an opportunity for a board that cannot act impartially as a whole to vest control of derivative litigation in a trustworthy committee of the board – *i.e.*, one that is not compromised in its ability to act impartially. The composition and conduct of a special litigation committee therefore must be such as to instill confidence in the judiciary and, as important, the stockholders of the company that the committee can act with integrity and objectivity.

How can the court and the company's stockholders reasonably repose confidence in an SLC whose Chairman has publicly and prematurely issued statements exculpating one of the key company insiders whose conduct is supposed to be impartially investigated by the SLC? The answer is that they cannot. Even if the SLC later issues a report in favor of dismissal that reads well and that appears to be factually supported, there will always linger a reasonable doubt that its investigation was designed to paper a decision that had already been made. When May's statement

is combined with the other record facts, most notably his SLC colleague Hanson's service with Scrushy (and former SLC member Striplin) on the board of a foundation that is obviously meaningful to them, it is inconceivable that the SLC will ever be able to meet its *Zapata* burden in support of a motion to terminate this litigation.[43]

Now, I suppose it can be argued that the motion to stay should be granted because the SLC might decide ultimately to support the procession of the litigations. But it seems to me wasteful to stay litigation for the purpose of allowing the SLC to announce its support for the procession of the derivative suits, when a contrary decision to terminate the litigation must necessarily be rejected because the SLC cannot demonstrate its independence. Nor is it apparent to me why the HealthSouth SLC's views on the appropriate forum in which to litigate the derivative claims raised in the Delaware Action and the overlapping claims in the Tucker Action are important. Given the record here, this court would have the same reason to doubt the SLC's independence regarding the issue of forum selection as it would about whether the cases should proceed at all.

For these reasons, I deny the SLC's motion to stay in deference to its investigation.[44]

---

**43.** This conclusion is reinforced by the nature of the claims raised in the Delaware Action. Whether the claims are meritorious depends in large measure on the knowledge and state of mind of the HealthSouth director-defendants who sold stock at times when they allegedly knew the adverse ramifications of the Group Rate Policy. Therefore, the determination to exonerate them will largely involve a subjective determination of the director-defendants' candor and good faith, given that there will be circumstantial evidence that at least some of them (*e.g.*, Scrushy) should have understood the consequences of the Group Rate Policy when they

sold. As a result, the SLC's ability to make that judgment impartially is critical.

**44.** It is with considerable reluctance that I rule differently on this question than did the Alabama Circuit Court, which faithfully followed the general rule in Delaware in a situation when plaintiff Tucker himself did not object to the stay. Nonetheless, the clarity of the record before this court is such that I believe a stay to be a futile and inefficient act. As noted earlier, I am confident that various courts involved can work out amicably a rational path forward, using any number of possible options.

## VIII. *Conclusion*

The SLC's motion for stay and/or dismissal is denied. IT IS SO ORDERED.

In this respect, it is notable that the Alabama Circuit Court faced a different decision than I did. Because the Tucker Complaint is a wide-ranging attack on many years of Scrushy's conduct, May's exonerating statement goes only to one small and incidental set of the issues in that case. By contrast, it goes to the heart of the matter in this one. Because May announced his belief in the innocent state of mind of the key executive at HealthSouth, Scrushy, a reasonable stockholder might well perceive that May had already determined that other trading directors who were not the company's CEO would have had even less reason to know about the effect of the Group Rate Policy.