# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PANKAJ SHARMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0090-NAC |
| | ) | |
| WESTELL TECHNOLOGIES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| STEVEN H. BUSCH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0346-NAC |
| | ) | |
| WESTELL TECHNOLOGIES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER CONSOLIDATING RELATED ACTIONS AND APPOINTING LEAD PLAINTIFF AND LEAD COUNSEL

WHEREAS:

1.      On October 1, 2020, Westell Technologies, Inc. ("Westell" or the "Company") undertook a transaction whereby the Company effected a 1-for-1,000 reverse stock split followed immediately by a 1,000-for-1 forward stock split (the "Transaction"). *Sharma v. Westell Technologies, Inc.*, C.A. No. 2022-0090-NAC (the "*Sharma* Action"), Docket Index ("D.I.") 1 ("*Sharma* Compl.") ¶6–7.   In

October 2020, following the completion of the Transaction, Westell took steps to delist and deregister the Class A common stock of the Company. *Id.* ¶7.

2.    Westell stockholders who owned fewer than 1,000 shares immediately prior to the reverse stock split received $1.48 in cash for each share they owned at the effective time of the reverse stock split. *Id.* ¶3. As a result, these cashed-out stockholders were no longer stockholders of the Company following the Transaction. *Id.*

3.    Westell stockholders who owned more than 1,000 shares immediately prior to the reverse stock split were not entitled to cash for their fractional shares in the Transaction. *Sharma* Action, Ex. B to D.I. 34 ("Proxy Statement") at 2.[1] Instead, those stockholders' fractional shares were subject to the forward stock split that immediately followed the reverse stock split. *Id.* According to the Proxy Statement filed in connection with the Transaction, "[a]s a result [of the Transaction], the total number of shares of the Company's Class A common stock and Class B common stock held by a Continuing Stockholder [would] not change, but their ownership percentage [would] increase." *Id.*

4.    On January 27, 2022, plaintiff Pankaj Sharma filed a Verified Stockholder Class Action Complaint commencing the *Sharma* Action.

---

[1] This Court "may take judicial notice of facts publicly available in filings with the SEC." *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 n.3 (Del. Ch. 2002).

5. On April 19, 2022, plaintiffs Steven H. Busch and Lindsey LaBate filed a Verified Class Action Complaint commencing the action styled *Busch v. Westell Technologies, Inc.*, C.A. No. 2022-0346-NAC (the "*Busch/LaBate* Action").

6. Both actions assert putative class action claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty relating to the Transaction on behalf of the cashed-out stockholders who owned fewer than 1,000 shares immediately prior to the Transaction. *Busch/LaBate* Action, D.I. 1 ("*Busch* Compl.") ¶11; *Sharma* Compl. ¶9. Both actions allege that the $1.48 per share cash-out price in the Transaction was unfairly low. *Busch* Compl. ¶¶40–51, 56; *Sharma* Compl. ¶¶76–90.

7. The *Sharma* Action also asserts a unique claim for "Insider Trading" against Defendant Timothy Duitsman, who is the Company's Chief Executive Officer and a director. *Sharma* Compl. ¶¶103–06.

8. The *Busch/LaBate* Action purports to bring unique class action claims on behalf of a "subclass" of stockholders who owned more than 1,000 shares and were not cashed out in the Transaction (other than Defendants). *Busch* Compl. ¶8. The *Busch/LaBate* plaintiffs refer to this "subclass" of continuing stockholders as the "Busch Subclass." *Id.*

3

9. On May 19, 2022, the plaintiffs in the *Busch/LaBate* Action moved to consolidate the two actions. *Sharma* Action, D.I. 18. Defendants join in the request for consolidation. *Sharma* Action, D.I. 20.

10. The *Sharma* Action plaintiff only opposes consolidation to the extent it would require consolidation with the Busch Subclass portion of the *Busch/LaBate* Action. *Sharma* Action, D.I. 27 at 25–29. The *Sharma* Action plaintiff acknowledges that consolidation with the "LaBate Subclass" would be appropriate. *Id.*; *Sharma* Action, D.I. 75 at 63–66.

11. The plaintiffs in the two actions have moved for appointment of lead plaintiff(s) and lead counsel. *Sharma* Action, D.I. 27; *Busch/LaBate* Action D.I. 18. The *Busch/LaBate* Action plaintiffs request that I appoint co-lead plaintiffs and co-lead counsel. *Busch/LaBate* Action, D.I. 64 at 1–2.

12. On March 2, 2023, I entered an Order granting Defendants' partial motion to dismiss the Busch Subclass claims (the "Dismissal Order").

NOW, THEREFORE, the Court having carefully considered the parties' papers and oral argument concerning consolidation and appointment of lead plaintiff and lead counsel, IT IS HEREBY ORDERED, this 2nd day of March 2023, as follows:

1. Court of Chancery Rule 42(a) provides the Court with the authority to manage the litigation before it, including consolidating actions that share common

4

issues of law or fact. *See Joseph v. Shell Oil Co.,* 498 A.2d 1117, 1123 (Del. Ch. 1985) ("Where there are common questions of law or fact cases may be consolidated.").

2.    Here, the *Busch/LaBate* Action plaintiffs and Defendants agree that the actions should be consolidated. The *Sharma* Action plaintiff's only objection to consolidation with the Busch Subclass claims is that it presents an undue risk of conflict between the subclasses. Because the Dismissal Order dismisses the Busch Subclass claims, that concern is now moot. Accordingly, I consolidate the two actions under a single caption, styled *In re Westell Technologies, Inc. Stockholder Litigation*, C.A. No. 2022-0090-NAC.

3.    I turn next to the competing applications for appointment of lead plaintiff and lead counsel. For this, the Court applies the "*Hirt* factors," so named after *Hirt v. U.S. Timberlands Service Company, LLC*, 2002 WL 1558342 (Del. Ch. July 3, 2002).

4.    The *Hirt* factors ask the court to consider the "(1) quality of the pleadings; (2) relative economic stakes; (3) willingness and ability to litigate vigorously; (4) absence of any conflict; (5) vigor of prosecution to date; and (6) competence and resources of counsel to prosecute the claims." *In re Kraft Heinz Co. Deriv. Litig.*, 2020 WL 1248471, at \*1 (Del.Ch. Mar. 13, 2020) (ORDER).

5. Turning to the first factor, Delaware courts recognize a "public policy interest favoring the submission of thoughtful, well-researched complaints—rather than ones regurgitating the morning's financial press." *Biondi v. Scrushy*, 820 A.2d 1148, 1162 (Del. Ch. 2003). "To that end, this Court recognizes the relative quality of the pleadings as an important factor to consider when competing counsel are vying for a leadership position." *In re Inv'rs Bancorp, Inc. S'holder Litig.*, 2016 WL 4257503, at *4 (Del. Ch. Aug. 12, 2016) (citation omitted); *see also In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 424886, at *2 (Del. Ch. Feb. 7, 2012) (observing that the quality of the complaint is a predictor of its successfulness and is a reflection of the "competence and investigative diligence of the counsel who filed it").

6. "In analyzing this factor, this court has often favored the movant who has utilized Section 220 documents more effectively or provided more factual fodder to support its claims." *In re Emisphere Techs., Inc. S'holders Litig.*, 2021 WL 5815994, at *4 (citation omitted).

7. In this instance, the *Sharma* Action complaint is clearly superior to the *Busch/LaBate* Action complaint. For example, the *Sharma* Action complaint makes extensive use of Section 220 documents. The *Busch/LaBate* Action complaint makes extensive use of pasted passages from the Proxy Statement. The *Busch/LaBate* Action complaint is also flawed for the reasons discussed in the Dismissal Order.

6

8. The *Sharma* Action complaint further reflects superior financial analysis relative to the *Busch/LaBate* Action complaint. The *Busch/LaBate* Action complaint, for example, appears to take issue with language commonly found in investment banker materials concerning the advisor's assumptions and reliance on management information. The *Busch/LaBate* Action complaint also focuses on book value metrics, while the *Sharma* Action complaint directs its allegations to methods of financial analysis more commonly employed by financial experts and this Court.

9. With respect to the second factor—relative economic stakes—*Hirt* instructs that the Court is to give this factor "great weight." 2002 WL 1558342, at *2 (citing *TCW Tech. Ltd. P'ship v. Intermedia Commc'ns, Inc.*, 2000 WL 1654504, at *4 (Del. Ch. Oct. 17, 2000)).[2] "The factor is given less weight, however, when neither of the competing plaintiffs' 'stake is . . . large enough to demonstrate a substantial relative difference' that would allow the Court to conclude that one plaintiff will press the case more diligently than the other." *In re Inv'rs. Bancorp, Inc. S'holder Litig.*, 2016 WL 4257503, at *2 (omission in original) (quoting *Wiehl v. Eon Labs*, 2005 WL 696764, at *3 (Del. Ch. Mar. 22, 2005)).

---

[2] The *Hirt* decision takes its "great weight" approach from *TCW Technology*, which in turn notes that this approach is modeled on federal securities litigation. *TCW Tech. Ltd. P'ship*, 2000 WL 1654504, at *4 (implicitly referencing the Private Securities Litigation Reform Act of 1995). I note that, in *TCW Technology*, the Court also made clear that it was "not suggesting that [this approach] should be mechanically applied in every case." *Id*.

10. Here, the Transaction cashed out stockholders owning fewer than 1,000 shares. This means that any representative plaintiff will necessarily have owned a relatively small number of shares.

11. Indeed, Ms. LaBate owned 600 shares, and Mr. Sharma owned 270 shares. Both stakes are relatively (and necessarily) de minimis. As a result, neither plaintiff is advantaged by this factor.

12. I note that counsel for Ms. LaBate argues that, because she bought her shares at $2.20 per share while Mr. Sharma paid an average of just over $1.49 per share, she had a substantially larger "out of pocket loss" in the Transaction. *Sharma Action*, D.I. 74 at 1–2. On this basis, counsel for Ms. LaBate argues that Ms. LaBate's losses are "135 times greater than [Mr.] Sharma's." *Id.* at 2–3.

13. As counsel for Mr. Sharma points out, this "out of pocket loss" argument seems misplaced and perhaps misunderstands the damages theory at issue. The relevant question here is the number of shares owned and, given the small stakes of both plaintiffs, the difference is de minimis.

14. The third *Hirt* factor—willingness and ability to litigate vigorously— also favors Mr. Sharma and his counsel. In addition to having the superior complaint, Mr. Sharma and his counsel commenced a Section 220 proceeding to obtain the books and records used to draft that complaint. *See Sharma v. Westell*

8

*Technologies, Inc.*, C.A. No. 2020-0838-LWW.[3]  Also, Mr. Sharma points out that Defendants answered his complaint.  *Sharma* Action, D.I. 9.  And, until this leadership dispute arose, he was actively pursuing discovery in his action.

15.     The fourth *Hirt* factor—the absence of any conflict—also favors the *Sharma* Action plaintiff or, at best, is a wash.  Here, there was an arguable conflict due to the presence of the *Busch* Subclass.  That potential conflict is resolved by the Dismissal Order.  I ultimately make no determination on whether the presence of the *Busch* Subclass would have constituted a conflict for these purposes, but the circumstances of its pleading do not count as a plus.[4]

16.     The fifth factor—vigor of prosecution to date— also favors the *Sharma* Action plaintiff and his counsel for the same reasons as the third factor.

17.     The final factor—competence and resources of counsel to prosecute the claims—is arguably in equipoise.  That being said, the circumstances of the *Busch* Subclass claims and arguments do not count as a plus.

---

[3] To be clear, the filing of a Section 220 proceeding does not automatically mean that this factor will favor the filing-stockholder.  This is not a purely mechanical test.  If it were, that would create highly unfavorable incentives for stockholders seeking a leadership role to file Section 220 proceedings regardless of their actual necessity.  Application of this factor therefore depends on the totality of the circumstances.

[4] Indeed, I suspect that the *Busch* Subclass claims were added without much thought, to give the *Busch*/*Labate* Plaintiffs leverage in negotiations over a potential co-lead role in this litigation.

18.     In summary, the *Hirt* factors, taken together, favor the appointment of the *Sharma* Action plaintiff and counsel as lead plaintiff and lead counsel.

19.     Before concluding, I briefly address the *Busch*/*LaBate* Plaintiffs' request for appointment as co-lead plaintiffs and co-lead counsel.  They argue that I should appoint them as co-lead plaintiffs and co-lead counsel because of a defense raised by Defendants in their answer to Mr. Sharma's complaint.  Defendants' answer asserts that Mr. Sharma lacks standing because he purchased his stock after the Transaction's announcement.  Given the disparity in pleading and approach to the litigation that I describe elsewhere in this Order, this argument does not move the needle in my view.  In these circumstances, to the extent this defense truly becomes an issue down the road, it can be addressed then.[5]

For these reasons, Mr. Sharma's leadership application is GRANTED. Counsel for Mr. Sharma shall submit a form of implementing order within ten days.

                                        */s/  Nathan  A.  Cook*
                                        Vice Chancellor Nathan A. Cook

---

[5] *See, e.g.*, *In re Emisphere Techs., Inc. S'holders Litig.*, 2021 WL 5815994, at *5 n.33 (Del. Ch. Dec. 6, 2021) (declining to "order a 'forced marriage'" because it "would not advance the best interests of [the] stockholders"); *Ryan v. Mindbody, Inc.*, 2019 WL 4805820, at *4 (Del. Ch. Oct. 1, 2019) ("[Y]ou play not your eleven best, but your best eleven. . . . Cognizant that forcing cooperation risks impairing team dynamics, this Court has repeatedly declined to craft its own leadership structure in lieu of selecting a team that the parties have formed themselves.").