### In re The TOPPS COMPANY SHAREHOLDERS LITIGATION.

C.A. No. 2786–VCS.

Court of Chancery of Delaware, New Castle County.

Submitted: May 8, 2007.
Decided: May 9, 2007.

---

Seth D. Rigrodsky, and Brian D. Long, Rigrodsky & Long, P.A., Wilmington, DE; Joseph A. Rosenthal, Rosenthal, Monhait & Goddess, P.A., Wilmington, DE; Robert M. Kornreich, and Carl L. Stine, Wolf Popper, LLP, New York City, for Plaintiff.

Gregory P. Williams, and Blake K. Rohrbacher, Richards, Layton & Finger, P.A., Wilmington, DE; Robert K. Payson, and Bradley W. Voss, Potter Anderson & Corroon, LLP, Wilmington, DE; Brian E. O'Connor, Russell D. Morris, and Andrew L. Weiner, Willkie Farr & Gallagher, LLP, New York City, for the various Defendants.

## OPINION

STRINE, Vice Chancellor.

This opinion resolves a motion to dismiss or stay a consolidated shareholder class action seeking to enjoin a merger transaction (the "Merger") in which The Topps Company, Inc. ("Topps"), a publicly traded Delaware corporation headquartered in New York, will be sold to a group of private equity buyers. The motion is unusual in that the defendants do not contend that Delaware is, in any way, an improper or inconvenient forum. In fact, the defendants preferred to have the propriety of the Merger decided by the courts of Delaware, the state whose law is at issue. Thus, the defendants sought leave to file a motion to stay identical actions pending in the courts of New York. But the defendants were denied leave to present their motion on the ground that the initial New York action, which was filed by an Ohio resident a day before the first Delaware action, was first filed. By that time, the various Delaware actions had already been consolidated and expedited discovery had begun. Soon thereafter, a schedule for the consideration of a motion for a preliminary injunction against the Merger's procession was set.

Presented with the inefficient prospect of litigating identical issues in two courts simultaneously, the defendants now seek to have this court refrain from hearing the injunction motion in order to avoid an unseemly and wasteful duplication of effort.

Although I am sympathetic for the defendants' plight, I deny the motion. In a representative action such as this one, the desire of an individual plaintiff to litigate in a forum other than the state of incorporation has no legal or equitable force, particularly when the plaintiff is not even a resident of the state in which he seeks to litigate. The paramount interest is ensuring that the interests of the stockholders in the fair and consistent enforcement of their rights under the law governing the corporation are protected. In a situation like this one, when all the actions are filed essentially simultaneously on the heels of the announcement of a transaction, the mere fact that one plaintiff won the filing Olympics by beating his competitors to court by a day also has no logical bearing on where the case should proceed.

■ Instead, well—settled principles of public policy and comity—as recognized by the United States Supreme Court and the New York Court of Appeals—point toward the appropriate basis for resolving where cases like this should be decided. In *Langfelder v. Universal Laboratories,*[1] the New York Court of Appeals stated that "it is well settled that jurisdiction in any case will be declined ... where a determination of the rights of the litigants involves regulation and management of the internal affairs of [a] corporation dependent upon the laws of [a] foreign state."[2] Moreover, "the fact that a foreign corporation may have its records and principal place of business in New York does not affect a decision to decline jurisdiction under the internal affairs doctrine."[3] The New York Court of Appeals' reasoning is grounded in the long-understood notion that when a corporation forms under the laws of a particular state, the rights of its stockholders are determined by that state's law and that the chartering state has a powerful interest in ensuring the uniform interpretation and enforcement of its corporation law, so as to facilitate economic growth and efficiency.

1. 293 N.Y. 200, 56 N.E.2d 550 (1944).

2. *Id.* at 204, 56 N.E.2d 550.

3. *Prescott v. Plant Industries, Inc.,* 88 F.R.D. 257, 262 (S.D.N.Y.1980); *see also Langfelder,* 293 N.Y. at 206, 56 N.E.2d 550.

*Langfelder* was no novelty, it is based on long-standing teaching from the United States Supreme Court that it "has long been settled doctrine that a court—state or federal—will, as a general rule, decline to interfere with, or control by injunction or otherwise, [a] corporation organized under the laws of another state but will leave controversies as to such matters to the courts of the state of domicile. . . ."[4] More recently, our nation's highest court has stated that

> No principle of corporation law . . . is more firmly established than a state's authority to regulate domestic corporations. . . . The beneficial free market system depends at its core upon the fact that a corporation—except in the rarest of situations—is organized under, and governed by, the law of a single jurisdiction, traditionally the State of its incorporation. . . . A state has an interest in promoting stable relationships among parties involved in the corporations it charters.[5]

As a corollary to those principles, the U.S. Supreme Court has also firmly held that no state has a legitimate interest "in regulating the internal affairs of foreign corporations."[6]

■ In a situation like this one, when this court is clearly an efficient and convenient forum prepared to issue a timely ruling, public policy and comity indicate that this state's courts should answer the question of whether the pending Merger involving Topps should be enjoined. In this regard, the reality is that the Topps Merger is part of a newly emerging wave of going private transactions involving private equity buyers who intend to retain current management. This wave raises new and subtle issues of director responsibility that have only begun to be considered by our state courts. This factor bears importantly on the question of where this case should be heard. When new issues arise, the state of incorporation has a particularly strong interest in addressing them, and providing guidance.[7] Noteworthy, too, is that the procession of cases like this in Delaware provide litigants the timely opportunity to seek review from this state's highest court, the Delaware Supreme Court, by way of requesting an expedited and direct interlocutory appeal. That opportunity for prompt definitive guidance is obviously unavailable in the courts of another state.

## I. *Factual Background*

Topps is a Delaware corporation with its principal executive offices in Manhattan. It is best known for marketing baseball cards and other memorabilia featuring professional athletes and popular television and movie characters. It also operates a confectionary business whose brands include quintessentially-American standards such as Ring Pops, Push Pops, and Bazooka Joe bubble gum. Topps was founded in 1938 and went public as a Delaware Corporation shortly after World War II.

On March 6, 2007, Topps announced that it had entered into a definitive agreement to be acquired by The Tornante Company, LLC and Madison Dearborn Partners, LLC (collectively, the "Private Equity Buyers") in the $9.75 per share all cash Merger. The next day, March 7, the first of a number of putative shareholder class

---

4. *Rogers v. Guaranty Trust Co. of New York*, 288 U.S. 123, 130, 53 S.Ct. 295, 77 L.Ed. 652 (1933).

5. *CTS Corp. v. Dynamics Corporation of America*, 481 U.S. 69, 89, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987).

6. *Edgar v. MITE Corp.*, 457 U.S. 624, 645–46, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).

7. *Armstrong v. Pomerance*, 423 A.2d 174, 178 (Del.1980); *Ryan v. Gifford*, 918 A.2d 341, 350–51 (Del.Ch.2007).

actions seeking to enjoin the Merger was filed in the Commercial Division of the New York State Supreme Court. The named plaintiff in that case is a resident of the state of Ohio and appears to have no substantial ties to New York.[8] The first Delaware action challenging the Merger was filed at 12:43 pm the next day, March 8 (i.e., only a few business hours later). By the end of the next week, a total of nine (five Delaware and four New York) complaints had been filed.

The consolidated complaints in the New York and Delaware actions contain virtually identical allegations. In sum, those complaints contend that the Topps board of directors failed to fulfill their fiduciary duties in a myriad of ways during the process leading to the signing of the Merger Agreement with the Private Equity Buyers, a Merger Agreement they contend allows the Private Equity Buyers to get Topps at a bargain price. In that connection, the plaintiffs raise concerns about conflicts of interest, the adequacy of the Topps board's pursuit of other bidders, the preclusiveness of the deal protections of the Merger Agreement on other interested parties, and the utility of a so-called "go shop" provision in ensuring value maximization. That is, the complaints raise a number of the emerging issues facing corporate directors, managers, and stockholders during this new wave of mergers and acquisitions activity, in which private equity buyers buy companies and retain current management.

On March 26, 2007, this court consolidated the various actions pending before it.[9] The plaintiffs promptly filed a motion to expedite. The defendants obviated the hearing on that motion by acceding to the expedited production of documents. As of that time, the New York actions had not been consolidated and no substantial activity was undertaken. Once it became clearer when a meeting on the Merger would be held, a hearing for a preliminary injunction was scheduled in this court for May 23. Due to a slippage in the finalization of the Merger meeting schedule, the date for the hearing has been moved to early June.

In the first week of April, a conference was held in the New York cases. At that conference, the defendants sought leave to present a motion to dismiss or stay the New York actions in light of the pending actions in Delaware, the expedited production that was about to begin, and the applicability of Delaware law to important issues facing a Delaware corporation and its stockholders. The court declined to permit the defendants to file their motion, in view of the fact that the first New York case had been filed a day before the first Delaware case. Thus, the defendants did not submit to the court the precedent, including that of the New York Court of Appeals, cited in this decision.

The defendants then sought a conference with this court and expressed concern about being whipsawed. At that conference, I expressed my initial view that Delaware was the appropriate forum to decide whether to enjoin a merger involving a Delaware corporation and that my prior experience had been that other courts recognized and deferred to our state's legitimate interests in these matters. I expressed my hope and anticipation that an agreement to that effect would be achieved. To that end, I encouraged the Delaware plaintiffs' counsel to reach out to their colleagues in the New York actions and offer jointly to prosecute the case

8. The plaintiffs in other of the New York actions are based in New Jersey. As far as I am aware, none of the named plaintiffs in the New York actions is a New York resident.

9. *See* Order of Consolidation (May 26, 2007).

here, and for the defendants to provide the New York plaintiffs with discovery simultaneously with the Delaware plaintiffs.[10] Within that same week, I encouraged the Delaware counsel to make clear that they were offering their colleagues in New York an equal seat at the table. Regrettably, none of these efforts has to date broken the logjam and the defendants felt compelled to file this motion, lest they face two injunction proceedings against the same transaction.

With that said, it appears that the New York Supreme Court is awaiting this court's ruling on this motion before deciding how to proceed. Although it has not permitted the defendants to file a motion to dismiss or stay, the New York Supreme Court has also indicated sensitivity to the need for the dispute to proceed in one forum.[11] I read that as saying that the New York Supreme Court is awaiting this court's ruling on this motion before making a determination whether to proceed. Indeed, another teleconference in the New York action is scheduled for May 10, at which the Court suggested it will consider the outcome of this Delaware motion to stay. For that reason, I have endeavored to issue this decision in an expedited fashion, in the hopes of ensuring an outcome consistent with the interests of efficiency, public policy, and comity.

## II. *Discussion*

The defendants have moved to dismiss or stay the Delaware proceedings primarily under the principles outlined in *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.*,[12] and, alternatively, under the related *forum non conveniens* doctrine.

■ As noted, however, this is an odd *McWane* motion. The defendants did not prefer to litigate this matter in New York, they preferred to litigate it here. But having been denied the chance to seek a stay of the New York matter, and facing dueling injunction hearings, the defendants are now taking the position that "New York is not an inconvenient forum," [13] and, in light of the New York court's failure as yet to stay the New York litigation, that it would be burdensome for the defendants to litigate here also.

This is a strained *McWane* motion for another reason. *McWane* most clearly applies when an individual plaintiff sues a defendant in a convenient forum and is then met with a responsive suit by the defendant in another forum.[14] In that circumstance, the first-filing plaintiff is rightly given primacy, assuming that her chosen forum is a convenient one that can do substantial justice between the parties.

■ In the representative action context, *McWane* has far less bite and for good reason.[15] A first-filing plaintiff has no legitimacy to "call forum" for all the other stockholders of a corporation, as if their rights turned on a schoolboy playground convention. What is most important is not that the filing plaintiff get her way, but that the stockholders she seeks to represent have their legitimate expecta-

---

10. Transcript of Status Conference (April 16, 2007) at 13–14, 18.

11. Transcript of Status Conference (April 20, 2007), *Lipscomb v. The Topps Co., Inc.*, N.Y. Sup.Ct., Index No. 600715/07, at 6.

12. 263 A.2d 281 (Del.1970).

13. Defendants' Opening Brief in Support of Their Motion to Dismiss or Stay at 9.

14. *McWane* itself involved a situation where a plaintiff brought a breach of contract claim in Alabama. A month later, the defendant in the Alabama case filed suit in Delaware asserting claims that were identical to counterclaims that it also brought in Alabama. *McWane*, 263 A.2d at 282.

15. *E.g., Biondi v. Scrushy*, 820 A.2d 1148, 1158–59 (Del.Ch.2003); *Ryan*, 918 A.2d at 349.

tions upheld. As Chancellor Chandler recently explained in the analogous context of a derivative suit:

A shareholder plaintiff does not sue for his direct benefit. Instead, he alleges injury to and seeks redress on behalf of the corporation. Further, ... any shareholder with standing may represent the injured party. Thus, this Court places less emphasis on the celerity of such plaintiffs and grants less deference to the speedy plaintiff's choice of forum. [Thus], this Court proceeds cautiously when faced with the question of whether to defer to a first filed [representative] suit, examining more closely the relevant factors bearing on where the case should best proceed, using something akin to a *forum non conveniens* analysis.[16]

The situation here is a perfect example of why this must also be so in the logically identical context of a putative class action. The reality is that every merger involving Delaware public companies draws shareholder litigation within days of its announcement. An unseemly filing Olympiad typically ensues, with the view that speedy filing establishes a better seat at the table for the plaintiffs' firms involved. Therefore, as explained in *Biondi*, the application of *McWane* to class and representative actions is "troublesome," because "the potential divergence in the best interests of the plaintiffs' attorneys and the plaintiffs they are purporting to represent ... are not addressed, and indeed may be exacerbated by a legal rule that places

determinative weight on which complaint was filed first." [17]

Just as it has no substantial weight in determining who should be lead counsel in a representative action, the fact that a particular plaintiff filed the first complaint in a wave of hastily-crafted class action complaints attacking a just-announced transaction has no rational force in determining where a motion to enjoin that transaction should be heard.[18] In fact, in our prior cases, we have treated complaints as simultaneously filed when there are trivial time differences.[19] That is the case here. The first New York Action was filed a day before the first Delaware Action. It is no more rational to give that factor great weight than it would be to declare that because there are five Delaware complaints, and only four New York complaints, the dispute should proceed in Delaware because there are more plaintiffs who want to litigate here, or because the five Delaware complaints were (as a group) filed more speedily than the four New York complaints (as a group). Trivialities like these should not drive important determinations.

This is not to say that the consideration of which action is first filed cannot play a useful tie-breaking role when all other considerations are equal. This is especially true when the first-filed action is farther along than the Delaware action and no other public policy considerations weigh heavily in favor of proceeding with the case here. But, in this current situation, the Delaware actions actually proceeded

**16.** *Id.* (citing *Biondi*, 820 A.2d at 1159).

**17.** *Biondi*, 820 A.2d at 1159.

**18.** *E.g., id.*

**19.** *In re IBP, Inc.*, 2001 WL 406292, at *7–8 (Del.Ch.2001) (treating two complaints filed five business hours apart as contemporaneously filed); *Friedman v. Alcatel Alsthom*, 752 A.2d 544, 551–52 (Del.Ch.1999) (refusing to treat a complaint filed in federal court in New York as first filed where it preceded the Delaware complaint by only a few hours in order to avoid rewarding the winner in a race to the courthouse); *In re Chambers Development Co., Inc. S'holders Litig.*, 1993 WL 179335, at *7 (Del.Ch.1993) (treating complaints filed "in the same general time period" as contemporaneous).

more briskly than the New York actions and the first-filed New York complaint was simply the winner in a filing derby completed within a week of the Merger's announcement. In this circumstance, other more compelling considerations become paramount.[20]

As the United States Supreme Court, the Delaware Supreme Court, and the New York Court of Appeals all recognize, a state has a compelling interest in ensuring the consistent interpretation and enforcement of its corporation law. Corporations are chartered by states, and the managers and investors who form them are free to choose from among a variety of laws to govern their relationships. Their contractual expectations deserve respect. The authority of a state to regulate the internal affairs of the corporations it charters is one of the oldest and most firmly established doctrines in American corporation law.[21] As the Supreme Court of the United States explained in *Edgar v. MITE Corp.*,[22] "[t]he internal affairs doctrine is a

... principle which recognizes that only one State should have authority to regulate a corporation's internal affairs, [i.e.,] matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders." [23]

Venerable authority recognizes that a chartering state's interest in promoting an efficient and predictable corporation law can be undercut if other states do not show comity by deferring to the courts of the chartering state when a case is presented that involves the application of the chartering state's corporation law. That recognition is easily understandable as it applies to Delaware's corporate law, which has a broadly enabling statute that gives directors wide leeway to manage the corporation, but subject to fiduciary duty review by a court of equity comprised of five judges dedicated in large measure to that specific purpose and further by an appellate court only a direct appeal away.[24] By contrast to the much larger federal judicia-

**20.** *See Atkins v. Hiram,* 1993 WL 287617, at *3 (Del.Ch.1993) (noting that it is less important that an action was first filed when neither action is in a more procedurally advanced state).

**21.** *See CTS Corp.,* 481 U.S. at 89, 107 S.Ct. 1637 ("No principle of corporation law is more firmly established than a state's authority to regulate domestic corporations.").

**22.** 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).

**23.** *Id.* at 645, 102 S.Ct. 2629.

**24.** This court's unique position as the regular arbiter of corporate law disputes, and the manner in which this court interacts with the Delaware Supreme Court have played an important role in the development of Delaware's corporate law. As one leading commentator has put it,

> One reason that Delaware fiduciary duty law is both coherent and adaptive in the classic common law tradition is that it is made by an informed group of judges who are repeat players on matters of corporate

law. Most American law on fiduciary duty is made in Delaware by a group of just ten judges. Five are on the Court of Chancery, the trial court where all corporate cases originate, and five sit on the Delaware Supreme Court which hears appeals from the Court of Chancery. For these chancery court judges their experience, both prior to and after becoming judges, gives them an unmatched expertise in the field of corporate law. In contrast, [veil] piercing cases are spread around the country. Delaware has less than one percent of all reported cases. For judges hearing piercing cases, corporate issues are not a major part of their docket and they seldom will have the opportunity to use any expertise they may have gained in another piercing case. The multiplicity of appellate courts which hear appeals from these cases likewise dilutes the possibility of repeat players among the judges. While the common law process enables each judge to draw on the best of the received wisdom from across the country, whatever coherence that may develop in the piercing area is not likely to match fiduciary duty in Delaware.

ry, ten judges are involved in these decisions, avoiding phenomena such as "circuit splits," which more than a decade ago were considered obstructive enough of commercial efficiency to impel the federal government to create the specialized Federal Circuit to handle all patent appeals.[25] The important coherence-generating benefits created by our judiciary's handling of corporate disputes are endangered if our state's compelling public policy interest in deciding these disputes is not recognized and decisions are instead routinely made by a variety of state and federal judges who only deal episodically with our law.[26]

Both the United States Supreme Court and the New York Court of Appeals understand these concerns and have instructed courts under their purview to accord comity to the courts of a corporation's chartering state. In *Rogers v. Guaranty Trust Co. of New York*,[27] the United States Supreme Court stated that "[i]t has long been settled that a court—state or federal—sitting in one state will as a general rule, decline to interfere with, or control by injunction or otherwise, [a] corporation organized under the laws of another state but will leave controversies as to such matters to the courts of the state of the domicile."[28] The courts of New York have long respected this teaching. Thus, for example, in *Langfelder*, the New York Court of Appeals upheld dismissal of a complaint that sought to determine the rights of preferred stockholders in a Delaware corporation following a stock-for-stock merger.[29] Likewise, Judge Learned Hand, one of New York's most distinguished jurists, observed that "when a trial involve[s] the internal affairs of a corporation, the rule is that the courts of a foreign forum will not assume jurisdiction over it."[30] Applying this precedent, the

Robert V. Thompson, *Piercing the Veil: Is the Common Law the Problem?*, 37 CONN. L.REV. 619, 628 (2005); *see also generally* Jill E. Fisch, *The Peculiar Role of the Delaware Courts in the Competition for Corporate Charters*, 68 U. CIN. L.REV. 1061 (2000) (explaining that Delaware law relies on judicial lawmaking in corporate law to a greater extent than other states and that the peculiar characteristics and specialization of the Court of Chancery play an important role in developing flexible and workable principles).

**25.** *See* 28 U.S.C. § 1295(a)(1) (granting the Federal Circuit exclusive jurisdiction over appeals from the United States District Courts in all patent cases); *Kennedy v. Wright*, 851 F.2d 963, 966 (7th Cir.1988) ("The Federal Circuit's exclusive jurisdiction under § 1295(a)(1) was created, after all so that there could be a uniform jurisprudence of patent law.").

**26.** Scholarship recognizes the importance of this concern. *See, e.g.,* Thompson, *supra* n. 24; Paul E. Loving, *The Justice of Certainty*, 73 OR. L.REV. 743, 743 n. 4 (1994) (discussing the need for certainty and predictability in the law, especially in regard to business planning and noting that the size and structure of the judicial system itself can create uncertainty:

"The more judges there are deciding cases, the more likely there will be conflicts in the law stemming from inconsistent interpretations of the law and case precedents."); Note, *The Rise and Fall of Patent Law Uniformity and the Need For a Congressional Response*, 81 CHI.-KENT L.REV. 713, 717–18 (2006) (reflecting upon the creation of the Federal Circuit to hear all patent appeals and noting that the lack of uniformity caused by diverse interpretation of the law by different courts "leads to forum shopping that not only increases litigation costs inordinately and decreases one's ability to advise clients, it demeans the entire judicial process and the patent system as well").

**27.** 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652 (1933).

**28.** *Id.* at 130, 53 S.Ct. 295.

**29.** *Langfelder*, 293 N.Y. at 206, 56 N.E.2d 550.

**30.** *Weiss v. Routh*, 149 F.2d 193, 195 (2d Cir.1945); *see also Prescott*, 88 F.R.D. at 261 ("Although there is no rigid, generalized rule as to what constitutes 'internal affairs' for this purpose, courts have declined jurisdiction where a decision would affect corporate structure or policy.").

United States District Court for the Southern District of New York, applying New York law, declined under the internal affairs rule to hear a case seeking a declaration of whether certain corporate directors were properly elected.[31] That decision noted that dismissal was particularly appropriate where a "determination of plaintiffs' contentions requires ascertainment of undeveloped Delaware law." [32]

The teaching of *Rogers* and *Langfelder* are implicated here. There can be no doubt of the importance to Delaware of its corporation law. Although our courts have deferred to clearly first-filed actions in corporation cases involving settled questions of law, such as derivative actions raising claims of self-dealing,[33] our courts have long been chary about doing so when a case involves important questions of our law in an emerging area.[34] Anyone interested in the mergers and acquisitions market knows that the current wave of going private transactions involving private equi-

ty buyers is presenting transactional planners with interesting new questions about how to address potential conflicts of interest and how to balance deal certainty against obtaining price competition in a very different market dynamic.[35] As with the phenomenon of stock options backdating, Delaware has an important policy interest in having its courts speak to these emerging issues in the first instance,[36] creating a body of decisional authority that directors and stockholders may confidently rely upon. Indeed, in Delaware's system of corporate law, the adjudication of cases involving the fiduciary duties of directors in new business dynamics is one of the most important methods of regulating the internal affairs of corporations, as these cases articulate the equitable boundaries that cabin directors' exercise of their capacious statutory authority. In the context of mergers and acquisitions—the context pertinent to this matter—most of the law governing directors' responsibility is set forth in our common law of corporations, not in our statute.[37]

---

**31.** *Prescott,* 88 F.R.D. at 261–263.

**32.** *Id.* at 263.

**33.** *E.g., Chambers,* 1993 WL 179335, at *3 (granting a motion to stay a case involving Delaware law fiduciary duty claims that were not novel and involved application of well settled law); *see also Dura Pharmaceuticals, Inc. v. Scandipharm, Inc.,* 713 A.2d 925, 931 (Del.Ch.1998) (granting a motion to stay in a case involving simple Delaware law issues of contract interpretation but suggesting an opposite result would obtain when complex issues of fiduciary duty are involved).

**34.** *E.g., Armstrong,* 423 A.2d at 178 (explaining that allowing substantial questions of Delaware law to be resolved in other courts "might create excessive uncertainty about the meaning of the Delaware law as a result of too many forums interpreting it since there would be no certiorari process available to the Delaware Supreme Court to resolve conflicts"); *MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.,* 1985 WL 21129, at *2 (Del.Ch. 1985) ("Where a novel, significant question of Delaware law is presented, it should weigh

... heavily against a motion to stay" because "these issues are best resolved in a Delaware court.").

**35.** Only two Delaware decisions have so far touched on the issues raised in the current deal environment. *See In re Netsmart Technologies, Inc. S'holders Litig.,* 2007 WL 926213 (Del.Ch.2007) (addressing several issues presented by this new deal paradigm); *In re SS & C Technologies, Inc. S'holders Litig.,* 911 A.2d 816 (Del.Ch.2006) (disapproving a settlement in a case involving a management-led cash-out merger supported by a private equity firm because several important issues about the way private equity buyouts are negotiated were not properly considered by the proponents of the settlement).

**36.** *See Ryan,* 918 A.2d at 350–51 (denying a motion to stay in a recent opinion addressing stock options backdating because of Delaware's interest in establishing its law on the subject).

**37.** Cf. *Hanover Affiliates Corp. v. Pamrex Corp.,* 236 N.Y.S.2d 94, 96 (N.Y.Sup.Ct.1963)

This policy interest far outweighs any other consideration in this case. The defendants do not even attempt to argue that this court is inconvenient for them. As with most corporate cases, the defendants are the ones who will produce most of the discovery and have their depositions taken. As they and all experienced corporate practitioners know, the discovery will take place in a location convenient to the party producing the documents and being deposed. Indeed, as indicated, the defendants preferred to have the dispute adjudicated here, so that the courts whose law is at stake will decide whether they complied with their duties.

Likewise, there is no countervailing interest any party has in litigating this case elsewhere. Representative plaintiffs seeking to wield the cudgel for all stockholders of a Delaware corporation have no legitimate interest in obtaining a ruling from a non-Delaware court. For investors in Delaware corporations, it is important that the responsibilities of directors be articulated in a consistent and predictable way. Random results may be good for plaintiffs'

lawyers who can use the uncertainty factor that comes with disparate forums to negotiate settlements of cases that might otherwise be dismissed as unmeritorious. But random litigation results are not good for investors. What investors want is to have cases fairly determined, to hold directors accountable either through injunctions against their improper actions when that is necessary to prevent threatened harm or through damages awards when the harm has already been incurred. But just as important, stockholders want to have unmeritorious cases dismissed without rewarding plaintiffs' lawyers for the simple fact that they filed a lawsuit.[38]

Here, the first filed action was brought by an Ohio resident in New York. His personal convenience is therefore of no relevance at all. Indeed, none of the New York plaintiffs are New York residents. Even if they were, a representative plaintiff has no cognizable interest in having a court of another state adjudicate a claim involving Delaware law.[39] Of equal importance is the fact that New York has no countervailing interest at stake that is

(noting that while in some situations New York courts have entertained breach of fiduciary duty suits involving foreign corporations, for the most part, those were merely cases in which stockholders sought redress for mismanagement, waste, or other misconduct by officers and directors, not cases seeking to enjoin corporate directors from consummating important corporate transactions).

**38.** Absent the rational sifting out of non-meritorious cases, stockholders suffer as the costs of litigation exact an undue toll on the procession of transactions valuable to stockholders and cause a harmful diminution in wealth-generating risk-taking by directors.

**39.** There is no rational basis to believe that stockholder-plaintiffs cannot secure important relief in the Delaware courts. A sampling of cases decided in the last year alone would belie that notion. *See, e.g., Sample v. Morgan,* 914 A.2d 647 (Del.Ch.2007) (denying defendants' motion to dismiss upon claims that corporate insiders entrenched and enriched themselves through a stock incentive pro-

gram); *ATR–Kim Eng Financial Corp. v. Araneta,* 2006 WL 3783520 (Del.Ch.2006) (awarding damages and attorneys fees to plaintiffs when controller removed assets from a Delaware corporation, refused to communicate with shareholders, and exercised bad faith in litigation); *Netsmart,* 2007 WL 926213 (finding reasonable probability of success on the merits for plaintiffs' claims that management did not properly shop the company and enjoining stockholder vote until curative disclosures were issued); *In re Tyson Foods, Inc.,* 919 A.2d 563, 2007 WL 1018209 (Del.Ch.2007) (ruling in the motion to dismiss context that alleged spring-loading of stock options stated a claim of disloyalty); *Ryan,* 918 A.2d 341 (holding that well-pled allegations of backdating options created a substantial likelihood of director liability and removed the presumption of valid business judgment for purposes of demand excusal); *In re Primedia Derivative Litigation,* 910 A.2d 248 (Del.Ch.2006) (finding that plaintiffs stated a claim against a controller for redemption of preferred stock by a "premature payment" at an "excessive price"); *Louisiana Municipal*

compromised by the procession of this case in Delaware. As the Supreme Court of the United States has long recognized, states have no legitimate interest in regulating the internal affairs of foreign corporations.[40] New York courts themselves have long acknowledged this.

Moreover, the fact that Topps is headquartered in New York has no bearing on where this particular suit should be heard. Topps has been incorporated in Delaware for generations. It has stockholders all over the nation. Those stockholders invested on the understanding that Delaware law would govern their relations with the firm. Now, it is unquestionably true

that the location of Topps' headquarters could have great importance in a choice of law or forum analysis if different types of claims were at issue. One can imagine a myriad of contract, employment, worker safety, environmental, and tort claims against Topps that would be much more properly heard in a New York court than in this court, irrespective of Topps' status as a Delaware corporation. In such cases, this court would not hesitate to defer in a "New York minute," as it were. Indeed, on several occasions, this court has displayed deference to the primacy of other states' interest in the evolution and enforcement of their laws.[41]

*Police Employees' Retirement System v. Crawford*, 918 A.2d 1172 (Del.Ch.2007) (finding disclosure violations in merger context and enjoining merger until stockholders were afforded appraisal rights); *Valeant Pharmaceuticals Intern. v. Jerney*, 2007 WL 704935 (Del. Ch.2007) (post-trial opinion requiring director to disgorge full amount of self-interested bonus received, plus interest, as well as pay damages flowing from that breach of loyalty). Indeed, some of the more controversial corporate decisions of Delaware courts in the last several years have involved rulings for stockholder-plaintiffs. *See, e.g., Omnicare Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del.2003); *McMullin v. Beran*, 765 A.2d 910 (Del.2000); *In re Emerging Communications, Inc. S'holders Litig.*, 2004 WL 1305745 (Del. Ch.2004). Nor can stockholder-plaintiffs believe that their lawyers will not receive appropriate remuneration in this court for achieving an important benefit for the corporation or a class of stockholders. *See, e.g., In re Telecorp PCS, Inc. S'holders Litig.*, C.A. No. 19260–VCS, Order and Final Judgment (Aug. 20, 2003) ($14.2 million attorneys' fee award); *In re Digex, Inc. S'holders Litig.*, C.A. No. 18336–NC, 2002 WL 749184, Order and Final Judgment (April 6, 2001) (more than $12 million fee award); *In re Best Lock Corp. S'holder Litig.*, C.A. No. 16281–CC, Order and Final Judgment (Oct. 16, 2002) ($13 million attorneys' fee award); *In re Pure Resources, Inc. S'holders Litig.*, C.A. No. 19876–NC, Order and Final Judgment (June 16, 2002) ($4.6 million attorneys' fee award); *In re Seagate Technology, Inc. S'holders Litig.*, C.A. No.

17932–NC, Final Order and Judgment (April 12, 2001) ($15.25 million attorneys' fee award); *In re Ascent Entertainment Group, Inc. S'holders Litig.*, C.A. No 17201–NC, Final Order and Judgment (December 18, 2000) ($4 million attorneys' fee award). That said, it is true that our courts take very seriously the responsibility of monitoring the representative litigation process and have not hesitated to dismiss non-viable claims, *e.g., McMillan v. Intercargo Corp.*, 768 A.2d 492 (Del.Ch.2000), or reject settlements that do not benefit the stockholders. *E.g., SS & C Technologies*, 911 A.2d 816.

**40.** *MITE*, 457 U.S. at 645–46, 102 S.Ct. 2629.

**41.** *See, e.g., Viking Pump, Inc. v. Liberty Mutual Ins. Co.*, 2007 WL 1207107, at *30 n. 133 (Del.Ch.2007) (resolving a summary judgment motion on certain specific undisputed facts and thereby declining the parties' invitation to make a broad pronouncement on an important issue of another state's law); *Midland Food Services v. Castle Hills Holdings*, 1999 WL 669324, at *1 (Del.Ch.1999) (declining to hear certain Ohio law counterclaims after claims involving important Delaware corporate law issues had been dismissed and leaving those claims for the Ohio courts); *IM2 Merchandising and Manufacturing, Inc. v. Tirex Corp.*, 2000 WL 1664168, at *10–11 (Del. Ch.2000) (granting a *forum non conveniens* motion where the Delaware law claims were trivial and substantial and difficult questions of Canadian law were involved); *cf. Weil v.*

But here, the location of Topps' headquarters has no rational relation to where this case should proceed. This case is about the responsibilities of directors of a Delaware corporation to the corporation and its stockholders under Delaware law. As the New York Court of Appeals stated in *Langfelder*, "the fact that a foreign corporation may have its records and principal place of business in New York does not affect a decision to decline jurisdiction under the internal affairs doctrine."[42]

Few contexts are more important to stockholders than the pendency of a transaction in which they exchange their shares for cash and the company is taken private. With a new M & A market dynamic have come important new issues of appropriate director responsibility that should be addressed in the first instance by Delaware courts. That is particularly the case when the question is whether to enjoin a merger transaction. It is a very delicate corporate law exercise to determine whether to enjoin a premium-paying merger affecting thousands of stockholders at the instance of stockholders holding a small fraction of the company's shares. In that respect, it is no insult to the courts of other states, and certainly not the courts of New York,[43]

---

*Morgan Stanley DW, Inc.*, 877 A.2d 1024, 1035 (Del.Ch.2005) (deciding to apply California law to the plaintiff's breach of fiduciary duty claims based on a contractual choice of law provision and noting that it would be "imprudent and inconsistent for a Delaware court to fail to give determinative weight to the parties' choice of California law. Our state obviously relies upon the willingness of other state courts to honor the choice of law reflected in the corporate charters of Delaware firms, even when the parties before them are not geographically situated in Delaware.").

**42.** *Langfelder*, 293 N.Y. at 206, 56 N.E.2d 550; *see also* Hanover Affiliates, 236 N.Y.S.2d at 95–96 (same).

**43.** New York is one of the states that has formed a commercial part of its court system to improve its handling of business disputes. That is admirable and nothing in this opinion suggests that the New York courts are not adroit at that function. But the intended purpose behind the creation of New York's and other states' commercial courts was to facilitate the more expert and efficient adjudication of business disputes involving their home states' laws. *See* Marcel Kahan & Ehud Kamar, *The Myth of State Competition in Corporate Law*, 55 STAN L.REV. 679, 710 (2002) (explaining that the creation of the commercial parts of the New York Supreme Court were not intended to help New York compete for incorporations and that rather, "[t]he design of commercial divisions is consistent with the stated goal behind their establishment; to shorten the long delays in the resolution of commercial disputes in New York's overburdened trial courts"); Judith S. Kaye, *Refinement or Reinvention, The State of Reform in New York: The Courts*, 69 ALB. L.REV. 831, 839–40 (2006) ("By the early 1990s, New York Courts were so overburdened that the business community and commercial bar often turned to federal courts and alternate private forums. Because commercial cases tend to be paper-intensive, they place heavy burdens on state supreme court justices who might have several hundred cases of all types on their dockets, which in turn led to delays."). These include huge numbers of important contract disputes governed by those laws and the states who have created such courts have an interest, akin to Delaware's, in having their own courts decide them in order to ensure the consistency of their commercial law. To a lesser extent, some of these courts—but not apparently New York's—were inspired by a desire to encourage businesses to incorporate in those states. *Compare* Rochelle C. Dreyfuss, *Forums of the Future: The Role of Specialized Courts in Resolving Business Disputes*, 61 BROOK. L.REV. 1 (1995) (discussing a proposal for a Pennsylvania Chancery Court designed to compete with Delaware in attracting corporations) *with* Kahan & Kamar, *supra* ("All these courts are divisions of the regular trial court and none affects the right to a jury trial. All have relatively broad jurisdiction, and thus deal mostly with more common contract and commercial disputes rather than with corporate law disputes, and none is designed to generate a coherent body of corporate law precedents.").

to say that the Delaware courts are better positioned to provide a reliable answer about Delaware corporate law in emerging areas like the ones presented by this dispute. That is especially so because appeals from this court go directly to the Delaware Supreme Court,[44] the definitive authority on our common law of corporations, which regulates much of the internal affairs of Delaware corporations.[45]

In the end, the only factor that really cuts in favor of New York as a forum is the fact that the New York court has, to date, not stayed its hand in deference to this court, and that the possibility for an unseemly and inefficient duplication of effort and for the production of inconsistent results therefore looms. But, as indicated, it appears to me from the transcripts of the New York proceedings that my learned colleague in New York was waiting to make that final determination until this court could consider this motion, based on the full briefing that he knew would be presented to me. In view of the comity traditionally shown by New York in these situations to the courts of the chartering state and mandated by *Langfelder*, I

Certainly, the states that create such courts have a legitimate interest, identical to Delaware's in this case, in having their own courts be the primary adjudicator of cases involving their own corporation laws. But, it is unsurprising that no commercial court's creation was justified as providing a forum for stockholders of *foreign* corporations to litigate cases governed by *foreign* law. That sort of attempt to become a tribunal for the regulation of foreign corporations is exactly what the United States Supreme Court and the New York Court of Appeals have proscribed as disruptive of commerce, the contractual expectations and rights of investors, and considerations of comity among sister states.

Relevantly, the very fact that states like New York have formed commercial parts buttresses the logic of *Rogers, Langfelder,* and other similar cases. Commercial parts allow judges to become experts in commercial law, who can then provide more coherent and timely guidance to parties seeking to engage in commerce in reliance on a state's law. The intuition that there is a value to specialization (and admittedly costs) in these areas applies here. It is not that judges in Delaware are somehow better than judges elsewhere; our judiciary would never make such a hubristic claim. Rather, like judges in New York and elsewhere charged with the responsibility to regularly decide certain types of cases under a particular governing law, it is natural to expect we have some advantage in our own domain. *See* Dreyfuss, *supra* at 18–20 ("Delaware's Chancery Court seems to have captured the benefits of specialization fully.... Delaware Chancery has succeeded nicely. Its understanding of financial markets has enabled it to decide questions in the

time frame required by the fast-paced transactions it regularly reviews."). As I noted in a prior conference in this case, I ask for chambers copies of decisions of other state courts when foreign law is at issue. I don't have those decisions on my shelves, and, in those cases, I must spend a good deal of time ensuring that I have grasped the full context and emphasis of a foreign jurisdiction's jurisprudence. For that reason, I have also deferred when it was possible to remit the question to the courts of the sovereign whose law was at issue. *E.g., IM2,* 2000 WL 1664168, at *10–11.

**44.** By contrast, New York has a system of intermediate appellate courts, divided by departments. *See A Court System for the Future: The Promise of Court Restructuring in New York State;* Report by the Special Commission on the Future of New York State Courts, at 15, 24–26 (Feb. 2007), *available at http://www.nycourts.gov/reports/courtsys–4future—2007.pdf; Report of the Office of Court Administration to the Chief Judge on the Commercial Division Focus Groups,* at 5 (July 2006), *available at http://www.courts.state.ny.us/reports/ComDivFocusGroupReport.pdf.* Even New York's highest court could not provide definitive guidance for the obvious reason that it is not the final arbiter of Delaware law.

**45.** *See* Dreyfuss, *supra* n. 43 at 28–29 ("Delaware's quality of decisionmaking is facilitated by the way that Chancery and the Supreme Court of Delaware interact.... [The Supreme Court's] own expertise means that it usually can appreciate all of the factors Chancery took into account in reaching its decisions.").

therefore have confidence that the result the defendants fear will not come to pass.[46]

### III. *Conclusion*

For all these reasons, the defendants' motion to dismiss or stay is DENIED. IT IS SO ORDERED. The parties shall present the briefing schedule on the motion for preliminary injunction discussed at the prior conference.

**46.** In this regard, I expect that the Delaware plaintiffs will continue to offer a meaningful role to their New York colleagues.