# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MS. MARY GIDDINGS WENSKE,                )
INDIVIDUALLY AND AS TRUSTEE OF            )
THE THOMAS HUNTER GIDDINGS, JR.           )
TRUST U/W/O THOMAS H. GIDDINGS            )
DATED 5/23/2000,                          )
                                          )
        Plaintiffs,                       )
                                          )
    v.                                    )        **C.A. No. 2017-0699-JRS**
                                          )
BLUE BELL CREAMERIES, INC., BLUE          )
BELL CREAMERIES, U.S.A., INC.,            )
PAUL W. KRUSE, JIM E. KRUSE,              )
HOWARD W. KRUSE, GREG BRIDGES,            )
RICHARD DICKSON, WILLIAM J.               )
RANKIN, DIANA MARKWARDT,                  )
JOHN W. BARNHILL, JR., PAUL A.            )
EHLERT, DOROTHY MCLEOD                    )
MACINERNEY, PATRICIA RYAN,                )
                                          )
        Defendants.                       )
                                          )
    and                                   )
                                          )
BLUE BELL CREAMERIES, L.P.,               )
                                          )
        Nominal Defendant.                )

## OPINION

Date Submitted:  July 15, 2019
Date Decided:  August 28, 2019

Jessica Zeldin, Esquire of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware and Scott G. Burdine, Esquire and David E. Wynne, Esquire of Burdine Wynne LLP, Houston, Texas, Attorneys for Plaintiffs.

Timothy R. Dudderar, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Defendants Blue Bell Creameries, U.S.A., Inc., Jim E. Kruse, Howard W. Kruse, Richard Dickson, William J. Rankin, Diana Markwardt, John W. Barnhill, Jr., Paul A. Ehlert, Dorothy McLeod MacInerney and Patricia Ryan.

Srinivas M. Raju, Esquire and Kelly L. Freund, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendants Greg Bridges and Paul W. Kruse.

Paul A. Fioravanti, Jr., Esquire and John G. Day, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware and Hugh C. Connor II, Esquire, Michael D. Anderson, Esquire and Caleb B. Bulls, Esquire of Kelly Hart & Hallman, LLP, Fort Worth, Texas, Attorneys for Defendant Blue Bell Creameries, Inc. and Blue Bell Creameries, U.S.A., Inc.

Joseph B. Cicero, Esquire and Gregory E. Stuhlman, Esquire of Chipman Brown Cicero & Cole, LLP, Wilmington, Delaware, Attorneys for Nominal Defendant Blue Bell Creameries, L.P.

Michael J. Maimone, Esquire and Joseph C. Schoell, Esquire of Drinker Biddle & Reath LLP, Wilmington, Delaware, Attorneys for Special Litigation Committee of Blue Bell Creameries, L.P.

**SLIGHTS, Vice Chancellor**

This derivative action arises from alleged failures by Defendant, Blue Bell Creameries, Inc. ("BBGP"), as sole general partner of Nominal Defendant, Blue Bell Creameries, LLP ("Blue Bell" or the "Partnership"), to operate the Partnership in compliance with the governing standards set forth in the Partnership's Limited Partnership Agreement (the "LPA"). The consequences of these failures, it is alleged, were widespread contamination at Blue Bell's ice cream production facilities, a listeria outbreak infecting scores of Blue Bell customers, a temporary shutdown of Blue Bell's operations and hundreds of millions of dollars of lost profits. Defendants moved to dismiss Plaintiffs' claims under Court of Chancery Rules 12(b)(6) and 23.1. The Court denied the motion to dismiss Plaintiffs' showcase breach of contract claim against BBGP upon concluding Plaintiffs had adequately pled demand futility with respect to BBGP.[1]

Nearly a year after the Court denied the motion to dismiss, BBGP created a committee of its board of directors that, in turn, formed a special litigation committee to "manage and control" the Partnership's claims against BBGP. Not surprisingly, the special litigation committee has moved to stay this derivative action to allow it time to conduct its investigation and make its determination. This is standard operating procedure for special litigation committees formed after derivative

---

[1] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *19 (Del. Ch. July 6, 2018), *reargument denied*, 2018 WL 5994971 (Del. Ch. Nov. 13, 2018).

litigation has commenced. It is also standard for this court to grant such requests, within reason, when properly made.

But this request is not proper. The Court already has determined that BBGP, the lone general partner, has "a disabling interest for pre-suit demand purposes."[2] BBGP has since purported to delegate its authority to manage the litigation asset to a committee of allegedly independent agents who are not general partners. As a matter of agency law, a principal who delegates authority to an agent will be deemed to maintain control over that agent's conduct, regardless of whether the principal actually exercises control. Any conflict that disables the principal disables the agent. Because BBGP, as principal, is not fit to decide how to manage the Partnership's claims against the Defendants (including the claims against BBGP itself), its purported special litigation committee, as agent, is likewise disabled. Consequently, the motion to stay must be denied because it has been brought by a special litigation committee with no authority to bring it.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, Mary Giddings Wenske and the Thomas Hunter Giddings, Jr. Trust U/W/O Thomas H. Giddings dated 05/23/2000, are limited partners of Blue Bell. BBGP is Blue Bell's sole general partner. On October 2, 2017, Plaintiffs brought a

---

[2] *Id.* at \*18 (quoting *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007)).

derivative action against BBGP, Blue Bell USA ("BBUSA") (which wholly owns BBGP) and individual directors of BBGP and BBUSA. As noted, Defendants moved to dismiss under Rule 23.1, which the Court denied, in part, upon finding that demand upon BBGP was excused because BBGP, as an entity, faced a substantial likelihood of liability for breach of the LPA.[3]

On April 8, 2019, BBGP's board of directors (the "Board") appointed two new directors.[4] Soon after, the Board designated these new directors as sole members of a Special Board Committee (the "Special Committee") empowered to form a special litigation committee of non-Board members (the "SLC"). The SLC, in turn, is empowered to investigate all matters at issue in the derivative litigation and determine whether it is in the best interests of Blue Bell and its limited partners to pursue the claims.[5] According to the SLC Resolutions, the SLC draws its authority to act for the Partnership from Section 6.11(c) of the LPA and Section 17-403(c) of the Delaware Revised Uniform Partnership Act ("DRULPA").[6] Section 6.11(c) of the LPA permits BBGP to:

---

[3] *Id.*

[4] Aff. of Michael A. Weidinger in Supp. of Special Litigation Committee's Mot. to Stay Proceedings ("Weidinger Aff.") (D.I. 103) ¶ 4.

[5] Weidinger Aff., Ex. B ("Special Committee Resolutions") at 1–2; *id.*, Ex. C ("SLC Resolutions") ¶¶ 6–7.

[6] Special Committee Resolutions at 1–2; SLC Resolutions ¶ 1.

act through any of its duly appointed officers or a duly appointed attorney or attorneys-in-fact. Each attorney or attorney-in-fact shall, to the extent provided by the General Partner in the power of attorney, have full power and authority to do and perform all and every act and duty that is permitted or required to be done by the General Partner hereunder.[7]

On May 8, 2019, the Special Committee appointed William P. Carmichael, Boris J. Steffan and Michael A. Weidinger, Esq. to serve on the SLC as "true and lawful agents and attorneys-in-fact . . . to be engaged directly by Blue Bell as agents of Blue Bell exercising the full authority of [BBGP] to manage and control the business and affairs of Blue Bell with respect to the Derivative Lawsuit . . . ."[8] The SLC's determinations are to be "final and binding upon [BBGP], and shall not be subject to review or approval by the Board of Directors of [BBGP]."[9]

The SLC now requests a stay of this derivative litigation to afford it time to investigate the claims and make its determination.[10]

## II. ANALYSIS

Special litigation committees serve an important function; they "promote confidence in the integrity of corporate decision making by vesting the company's

---

[7] Weidinger Aff., Ex. A ("LPA") § 6.11(c).

[8] SLC Resolutions ¶ 1.

[9] *Id.* ¶ 8.

[10] Motion of Special Litigation Committee of Blue Bell Creameries, L.P. to Stay Proceedings (D.I. 102).

power to respond to accusations of serious misconduct by high officials in an impartial group of independent directors."[11]   A well-functioning, well-advised special litigation committee, "whose fairness and objectivity cannot reasonably be questioned," can serve to "assuage concern among stockholders" that the company's litigation assets are being managed properly.[12]  For this reason and others, the proper use of the special litigation committee device is to be encouraged.

Once the board forms a special committee, this court typically (but not always) grants a stay of litigation to afford the committee time to determine whether the derivative action should be prosecuted.[13] With that said, before this court will bless a special litigation committee's existence, and make accommodations to allow

---

[11] *Biondi v. Scrushy*, 820 A.2d 1148, 1156 (Del. Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004).

[12] *Id.  See also Zapata Corp. v. Maldonado*, 430 A.2d 779, 787 (Del. 1981) (observing that a special committee of the board comprised of independent directors can manage litigation on behalf of the company in a manner that instills confidence in the company's stockholders); *In re EZCORP Inc. Consulting Agmt. Deriv. Litig.*, 2016 WL 301245, at *32 (Del. Ch. Jan. 25, 2016) ("Section 141(a) vests statutory authority in the board of directors to determine what action the corporation will take with its litigation assets, just as with other corporate assets.").

[13] *See, e.g.*, *Abbey v. Computer & Commc'ns Tech. Corp.*, 457 A.2d 368, 375 (Del. Ch. 1983) (granting indefinite stay); *In re infoUSA, Inc., S'holders Litig.*, 2008 WL 762482, at *3 (Del. Ch. Mar. 17, 2008) ("Consequently, as this Court 'almost invariably' does, I hereby grant the SLC's motion to stay.") (citation omitted).  *But see Carlton Inv., Inc. v. TLC Beatrice Int'l Hldgs., Inc.*, 1996 WL 33167168, at *10 (Del. Ch. June 6, 1996) (Allen, C.) (denying motion to stay as untimely); *Biondi*, 820 A.2d at 1165 (denying motion to stay because special committee was demonstrably not independent).

it to work, the court must first be satisfied the committee has been properly constituted. This threshold question has been called here.

## A. Special Litigation Committees in the Alternative Entity Context

Under the seminal *Zapata v. Maldonado*, even a conflicted corporate board can wrest control of a derivative claim from a stockholder by establishing a committee of independent directors to investigate the claim and determine whether to prosecute it.[14] *Zapata* rests on a cornerstone of our corporate law. The board of directors of a Delaware corporation is vested by statute with the authority to manage the business and affairs of the corporation.[15] This authority includes the authority to delegate decision making to committees comprised of fewer than all members of the board.[16] Thus, when the board confronts a conflict of interest among some of its

---

[14] *Zapata*, 430 A.2d at 786 ("We do not think that the interest taint of the board majority is per se a legal bar to the delegation of the board's power to an independent committee composed of disinterested board members. The committee can properly act for the corporation to move to dismiss derivative litigation that is believed to be detrimental to the corporation's best interest.").

[15] *Id.* at 782 ("Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from [8 *Del. C.* § 141(a)].").

[16] *Id.* at 785 ("Section 141(c) allows a board to delegate all of its authority to a committee."); *id.* at 786 (citing 8 *Del. C.* § 144, "[b]y analogy to our statutory section on interested directors, it seems clear that the Delaware statute is designed to permit disinterested directors to act for the board."). Of course, the delegation of management authority by a conflicted board to an independent committee of the board is the delegation of authority by a conflicted group of principal decision makers to a subset of unconflicted principal decision makers. There is no principal/agent relationship created in this context.

6

members, the board may make decisions on the subject of the conflict by appointing a committee of independent directors empowered to act for the entire board.[17]

The *Zapata* special litigation committee framework, as a general matter, can serve its intended purpose in the partnership context.[18] The constitutive documents of the typical limited partnership will vest the general partners with broad authority to manage and control the business and affairs of the limited partnership.[19] Under 6 *Del. C.* §§ 17-1001–03, this authority can include the right to determine whether to prosecute derivative actions.[20] And, under 6 *Del. C.* § 17-403(c), unless otherwise restricted in the partnership agreement, the general partner has "the power and authority to delegate" management rights to "agents, officers, and employees of the general partner or the limited partnership."[21] But, just as the special litigation

---

[17] *Id.* at 786.

[18] *See Katell v. Morgan Stanley Gp., Inc. (Katell IV)*, 1995 WL 376952, at *9–13 (Del. Ch. June 15, 1995) (noting that most limited partnership agreements provide the general partner with broad management authority, including control over litigation assets). When a partnership creates a valid special litigation committee in the midst of derivative litigation, a stay of the litigation will be justified in the same circumstances a stay would be justified in the corporate context. Of course, the opposite holds true as well. *Biondi*, 820 A.2d at 1165.

[19] *See* 6 *Del. C.* § 17-403.

[20] *See Katell v. Morgan Stanley Gp., Inc. (Katell II)*, 1993 WL 205033, at *2 (Del. Ch. June 8, 1993) (citing 6 *Del. C.* §§ 17-1001–03) (agreeing with defendants that "general partners of limited partnerships are vested with the sole authority to manage the partnership affairs . . . including the right to determine whether derivative actions should proceed").

[21] 6 *Del. C.* § 17-403(c) ("Unless otherwise provided in the partnership agreement, a general partner of a limited partnership has the power and authority to delegate to 1 or more

committee of a corporate board must be independent to be effective under *Zapata*, so too must the special litigation committee of the general partner of a limited partnership be independent if it is to perform its mandate properly and with binding effect.[22]

In assessing board level conflicts in the corporate context, this court "counts heads" among the individual members of the board to assess whether a majority of its members are, or are not, conflicted.[23] Accordingly, because "the problem [of a conflicted board] is one of member disqualification, not the absence of power in the board," a special litigation committee of independent board members can assume the board's responsibility to decide how best to exploit a litigation asset.[24]

---

other persons any or all of the general partner's rights, powers and duties to manage and control the business and affairs of the limited partnership. Any such delegation may be to agents, officers, and employees of the general partner or the limited partnership and by a management agreement or another agreement with, or otherwise to, other persons.").

[22] *Biondi*, 820 A.2d at 1165.

[23] *See Frederick Hsu Living Trust v. ODN Hldg. Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017). *See also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361–64 (Del. 1993) (requiring director-by-director analysis); *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006) (same); *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004) (same).

[24] *Zapata*, 430 A.2d at 786; *see also Obeid v. Hogan*, 2016 WL 3356851, at *11 (Del. Ch. June 10, 2016) ("[T]he board as an institution 'retained all of its corporate power concerning litigation decisions' and it therefore possessed the power to determine what would happen to a litigation asset. The fact that demand was excused, futile, or otherwise rendered unnecessary did not 'strip the board of its corporate power . . . . The problem is one of member disqualification, not the absence of power in the board.'").

8

In the limited partnership context, however, the court does not draw a distinction between a general partner and the members of its board of directors when assessing conflicts. The conflict analysis, instead, focuses on the general partner as an entity, not the individual members of its decision-making apparatus.[25] As this Court has recognized, adopting the "director-by-director" approach

> would undermine the state's established policy of respecting the legal fiction of the business entity. It runs counter to the notion of the business judgment rule because it accords the business entity no role as general partner . . . . Furthermore, [the alternative] approach runs counter to the contractual freedom granted parties to a limited partnership by DRULPA § 17-1101(c) because it forces them to treat a corporate general partner's board of directors as the *de facto* general partner.[26]

Thus, when undertaking a demand futility analysis, unless the limited partnership has agreed to include features of a corporation's governance structure that would mandate a different approach,[27] the court makes no assessment of conflicts at the board level when assessing whether a corporate general partner is fit to consider a

---

[25] *See Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *13 (Del. Ch. Jan. 18, 2013); *Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2007 WL 2982247, at *8–9 (Del. Ch. Oct. 9, 2007); *Gotham v. Hallwood Realty P'rs, L.P.*, 1998 WL 832631, at *5 (Del. Ch. Nov. 10, 1998).

[26] *Gotham*, 1998 WL 832631, at *5 (internal citation omitted).

[27] *See, e.g.*, *DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *18 (Del. Ch. Sept. 30, 2013) (holding that demand should be made against the board of a general partner where the board was elected by the limited partners and the board's members owed fiduciary duties to the limited partners).

9

demand.[28]  By implication, an exclusive general partner, in contrast to a conflicted corporate board, retains no power to investigate a derivative claim or to determine whether to pursue the claim once the general partner has been deemed conflicted. And the general partner cannot cure its disability by appointing new members to its board of directors, or by contracting out its authority to manage the litigation asset to third parties because it no longer has that authority.

## B. The SLC Cannot Be Deemed Independent

As in *Biondi*, the question here is whether, as a matter of law, the SLC can be deemed independent under *Zapata* such that it can "exercise [] independent business judgment."[29]  More precisely, the question is whether BBGP, as Blue Bell's exclusive general partner, after already having been deemed unfit to consider a litigation demand, can avail itself of the *Zapata* framework by establishing a special litigation committee comprised of non-general partner actors.

In *Katell II*, then-Vice Chancellor Chandler determined that the extension of the *Zapata* doctrine to partnership law depends upon whether the limited partnership agreement allows the entity to create a special litigation committee.[30]  Because the

---

[28] *Wenske*, 2018 WL 3337531, at *18 (citations omitted).

[29] *Id.*

[30] *Katell II*, 1993 WL 205033, at *2–3; *see also id.* at *2 (citing 2A R. Balotti & J. Finkelstein, *The Delaware Law of Corporations and Business Organizations*, § 10.3 at DLP-231 (1991 Supp.)) ("As a general rule, in the absence of Delaware authorities

limited partnership agreement at issue there required the two general partners to act unanimously on important matters like the management of derivative litigation, the court concluded the independence required by *Zapata* could not be achieved because one of the general partners was conflicted.[31]  Specifically, the court determined the lone conflicted general partner could take no role in the management of the litigation asset, nor could it delegate that task to a special litigation committee.[32]  Following that ruling, the limited partners agreed to amend the limited partnership agreement to allow the non-conflicted general partner alone to manage the litigation asset.[33] The non-conflicted general partner was then permitted to act as a special litigation committee for the limited partnership.[34]

At first glance, the LPA does not nullify what has been done here. Section 6.1(a) vests BBGP with the "exclusive right and full authority to manage, conduct, control and operate the Partnership's business."[35]  And, as permitted by 6 *Del. C.* § 17-403(c), Section 6.11(c) authorizes the general partner to appoint an

---

addressing an issue in the limited partnership context, analogues to corporate law may be applied.").

[31] *Id.* at *5.

[32] *Id.*

[33] *Katell III*, 1993 WL 390525, at *1; *Katell IV*, 1995 WL 376952, at *7–8.

[34] *Id.*

[35] LPA § 6.1(a).

11

agent to act as if it were the general partner.[36]  Thus, in the ordinary course, BBGP could delegate its authority to manage litigation claims, including the investigation of a putative or asserted derivative claim.  The problem for BBGP is that I have determined it is disabled by conflict from considering what to do with Plaintiffs' derivative claims.  And, unlike the limited partnership in *Katell*, Blue Bell has no other general partner to pick up that mantle.[37]

BBGP has attempted to deal with this dynamic by delegating its decision-making authority to agents who are not general partners as if those agents can act as principal decision makers.[38]  But that is not how the principal/agent relationship works.  A defining feature of the principal-agent relationship is the principal's inherent control over the agent's conduct,[39] "and it is the existence of the right to

---

[36] *Id.* § 6.11(c).

[37] In the corporate context, Blue Bell is, by analogy, a lone conflicted director.  That loan conflicted director cannot serve as or create a special litigation committee.  *See Zapata*, 430 A.2d at 787.

[38] SLC Resolutions ¶¶ 1, 8.  The SLC Resolutions state that the SLC was "engaged directly by Blue Bell as agents of Blue Bell . . . ."  SLC Resolutions ¶ 1.  This statement blinks at the reality of Blue Bell's governance structure.  Blue Bell acts either through its general partner, BBGP, through agents appointed by BBGP or by a vote of its limited partners.  LPA §§ 6.01, 6.02, 6.10, 6.11(c).  As is clear from the Special Committee Resolutions and the SLC Resolutions, BBGP, not Blue Bell, created the SLC.

[39] 3 Am. Jur. 2d Agency § 18 ("Fundamental to the existence of an agency relationship is the right to control the conduct of the agent with respect to the matters entrusted to him or her.").

control, not its exercise, which is decisive."[40] Thus, a delegation of authority by principal to agent does not set asunder the principal's right to control the agent.[41] For a special litigation committee, it is precisely the *lack of control* by the conflicted principal over the non-conflicted principal that legitimizes the committee's creation, investigation and ultimate decision of whether *vel non* to pursue the derivative claim. A special litigation committee that cannot act without the looming influence of the conflicted general partner is not legitimate under *Zapata*.[42]

Apparently mindful of its conflict, BBGP attempted to obscure its disability by adding two independent members, designating them as an independent Special Committee of its board and then having that committee delegate authority to the SLC. In the corporate context, these measures likely would be effective. But in the limited partnership context, the Court's finding that BBGP is disabled from considering a demand ends the inquiry. The lone general partner, as an entity, is conflicted. That some members of its board, whether pre-existing or newly

---

[40] *Id.*

[41] *Id.*

[42] *Biondi*, 820 A.2d at 1156 ("[I]f the committee is not fully empowered to act for the company without approval by the full board . . . its ability to instill confidence is, at best, compromised, and at worst, inutile."); *Freedman v. Rest. Assocs. Indus., Inc.*, 1990 WL 135923, at *7 (Del. Ch. Sept. 19, 1990) (applying entire fairness "where . . . the management group could (and did) veto any action of the special committee that was not agreeable to the conflicted interests of the management directors").

appointed, might be independent is irrelevant.[43]  There is no non-conflicted principal

decision maker who can properly delegate management authority.

### III.  CONCLUSION

Where, as here, it is "clear that [the Court] will never be able to defer to a

decision by the [SLC], a stay would serve no rational purpose. . . ."[44]  Accordingly,

the SLC's motion to stay must be **DENIED**.

**IT IS SO ORDERED.**

---

[43] *See Gotham*, 1998 WL 832631, at \*5.

[44] *Biondi*, 820 A.2d at 1150.  *See also id.* at 1165 ("It would be futile and wasteful to issue
a stay when the undisputed facts will make it impossible for the Court later to accept the
decision of the special litigation committee to terminate the derivative litigation because
the committee will not be able to satisfy its burden under *Zapata* to show that it exercised
an independent business judgment.").

14